LEONA BOYD, Appellant, *v.* THE INDUSTRIAL COMMISSION *et al.* (Firestone Tire & Rubber Co. *et al.*, Appellees).

Fourth District   No. 4—84—0094WC

Opinion filed September 25, 1984.—Rehearing denied November 9, 1984.

Serkland & Muelhausen, of Chicago (James C. Serkland, of counsel), for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Patricia Rosen, Assistant Attorney General, of counsel), for appellee Industrial Commission.

Henry D. Noetzel & Associates, Ltd., of Peoria (William J. Thomas, of counsel), for appellee Firestone Tire & Rubber Company.

JUSTICE KASSERMAN delivered the opinion of the court:

Petitioner, Leona Boyd, filed an application for adjustment of a claim under the Workers' Compensation Act (Ill. Rev. Stat. 1977, ch. 48, par. 138.1 *et seq.*) for an injury to her right hand. An arbitrator found that Boyd had permanently lost 100% of the use of the hand but did not find that she was permanently totally disabled. The Industrial Commission affirmed the arbitrator's decision. The circuit court of Macon County confirmed the decision of the Commission. Boyd has perfected this appeal.

Boyd has been employed by respondent Firestone Tire & Rubber

Company since 1954. On October 13, 1960, while she was working for respondent at respondent's World Bestos division in New Castle, Indiana, Boyd sustained a right-hand injury in the course of her employment, resulting in the amputation of her ring and middle fingers as well as the heads of the metacarpals of those two fingers. She was compensated for the permanent loss of the use of 55% of the hand. An eye examination on February 8, 1977, established her uncorrected vision as 20/400 right, 20/200 left, correctable to 20/20 bilaterally. Boyd was fitted with contact lenses on that date. Boyd was born in 1931 and has a 10th-grade education.

The injury complained of occurred April 18, 1977, at respondent's Decatur, Illinois, plant. According to Dr. David Barnes, who examined Boyd, she told him "she was 'pulling apart stuck rubber off a skid' and suddenly had a sharp pain in the metacarpal phalangeal joint of her index finger." On June 26, 1979, Dr. James Steichen performed a fusion of the distal phalangeal joint of the small finger of the right hand.

Respondent stipulated before the Commission that petitioner has now lost 100% of the use of the right hand as a result of the 1977 injury, having lost 55% of the use of her right hand in a prior work injury. In pertinent part, the exhibits at the September 16, 1980, hearing before the arbitrator were as follows:

In a May 17, 1977, letter to Boyd, Dr. Joseph Schrodt stated, "I think it would be important that you not lift more than ten pound objects."

In a July 8, 1977, letter to respondent's medical department, Dr. Steichen stated that in his opinion it was going to be difficult for Boyd to continue working using the hand, as she had continuing pain; also, Boyd had previously had much trouble on a one-handed job due to the stress to her good hand which "places her in a very compromising position."

In an October 17, 1978, "Status Report" in checklist form, Dr. Steichen noted that Boyd was under hs care, was not totally or partially disabled, was working, had no work limitations, will need additional surgery, and that her condition was presently worsening.

In a letter dated March 6, 1980, Dr. Barnes stated his findings after an examination of Boyd and explained why the 1977 injury did not cause Boyd's present problems with her hand. Dr. Barnes stated that Boyd told him she was "anxious" to return to work; however, no opinion is stated regarding Boyd's ability to use the hand for work or otherwise. Problems with the hand noted by Dr. Barnes include pain in the index finger from cold exposure or prolonged usage, ulnar drift

and subluxation of the metacarpal phalangeal joint of the index finger, possible arthritis, and destruction of the metacarpal arch, which "distorts the mechanical forces within the hand. *** A sort of falling together, if you like."

Before the Commission, the parties stipulated, *inter alia*, that on or about January 28, 1981, Boyd had moved to Indiana, about 200 miles from Decatur, Illinois, that she had resided there ever since, and that her last name was now Davis as the result of a January 1981 judgment of dissolution of marriage.

Boyd testified at the hearing before the Commission on July 28, 1981, that she had not returned to work since the arbitration hearing, that she had "previously" reported to respondent ready to work, that she had submitted doctors' reports to respondent, and that she had not approached any potential employers other than respondent. According to Boyd, since the arbitration hearing she had phoned respondent seeking work and had been told to wait and that she would be called. According to Boyd, she phoned Dan Keller, who was then president of the union, late in September 1980 in an attempt to return to work; that Keller said he would inquire; and that Keller called back the same day and said that he had talked to Jack Dearth, who said that there was no work for her then. Asked whether she had spoken to a representative of respondent at that time, Boyd replied that she had tried previously, but her calls had not been returned.

Larry Harper, present president of Boyd's union, testified regarding two telephone conversations he had had with Jack Dearth the morning of the hearing before the Commission. According to Harper, he made inquiry as to why Boyd was not working, and Dearth called back and said that with a 10-pound lifting limitation on her hand, there was no work she could do for respondent.

After a continuance, the hearing before the Commission resumed on October 27, 1981. At that time, John Dearth, labor relations manager at respondent's Decatur plant, testified as follows: Respondent's records showed that Boyd was a fork truck operator from October 3, 1978, to January 18, 1979, and was a tire checker and labeler from February 23, 1979, until March of 1980, when "she was placed on sick suspension." She had not worked for respondent since. No lifting was required on the part of a forklift operator, although the job sometimes involved restacking loads. There were service and utility employees to do this for a driver who was unable. Forklift controls included steering wheel, lift lever, tilt lever, and gear shift. Some incidental lifting was also part of a labeler's job. The tires which one might be required to move each weighed between 13 and 30 pounds. The witness testi-

fied that Boyd had not contacted him regarding returning to work. He further stated that he had talked to Harper on July 28, 1981, regarding Boyd's capacity to work, and her weight-lifting restriction had been discussed. The witness had the authority to call Boyd back to work immediately if she had her doctor's release; however, this had not occurred, and her file presently showed a 10-pound lifting restriction. Asked whether he was prepared to offer Boyd a job as either a forklift operator or a labeler, the witness replied that he was, if she obtained a doctor's release.

Harper, who had worked at respondent's Decatur plant for 15 years, testified: If something fell off of a forklift, the operator picked it up. There was no one whose job it was to assist in such case. In daily operations, people help various other people, but it was no one's job. Service and utility personnel people are intended to fill in for absentees. Forklift driving was not a one-handed job, and to the witness' knowledge, no one but Boyd had tried it. A checker and labeler's duties included restacking and final sorting if necessary.

In finding that Boyd had failed to prove that she was temporarily or permanently totally disabled, the Commission found that there was no evidence as to why Boyd stopped working in March 1980 or that she was unable to work as a forklift driver or as a checker and labeler because of her injury. The Commission also found that Boyd had not sought work since the arbitration hearing, except for telephoning her union's president, and had not asked respondent for work. The Commission expressly relied on Dearth's testimony that Boyd could return to work at a job within her restrictions if she requested a job and had a doctor's release. The Commission also rejected Boyd's claim for Second Injury Fund compensation, finding that petitioner had not lost 100% of the use of either eye, her vision being normal with corrective lenses.

■ We first consider Boyd's contention that she is entitled to Second Injury Fund compensation (Ill. Rev. Stat. 1977, ch. 48, par. 138.8(e)(18)) and find that the Commission's decision to the contrary was not against the manifest weight of the evidence. The Commission is not required to adopt either corrected or uncorrected vision to the exclusion of the other as the measure of loss of use of an eye. (See *Pridgeon v. Industrial Com.* (1982), 89 Ill. 2d 477, 479, 433 N.E.2d 659, 660; *State Treasurer v. Industrial Com.* (1979), 75 Ill. 2d 240, 245, 388 N.E.2d 419, 421.) The extent of loss of use of an eye is a question of fact, and the findings of the Commission thereon will not be disturbed on review unless contrary to the manifest weight of the evidence. (*Pridgeon v. Industrial Com.* (1982), 89 Ill. 2d 477, 481, 433

N.E.2d 659, 661.) Boyd's vision being correctable and in fact corrected to 20/20, the Commission could properly conclude that no complete loss of use of Boyd's eyes had been sustained in view of the above authorities. The Second Injury Fund was properly held not liable in the instant case.

■ We turn to Boyd's contention that the Commission erred in finding that she was not proved to be totally and permanently disabled. First, Boyd contends that the Commission erred in concluding that she worked from October 3, 1978, to January 18, 1979, as a forklift driver and from February 23, 1979, to March 1980 as a checker and labeler. Boyd argues that she did not quit working in March 1980, but rather was already off work and attempting to return. Urged in support of Boyd's argument are Dr. Steichen's December 14, 1979, letter, indicating that Boyd had a fusion of her small right finger in June of 1979, and Dr. Barnes' March 6, 1980, letter reciting Boyd's statement that she was anxious to return to work. Boyd did not testify regarding when or why she left work. We conclude that the Commission did not err in deciding to accept Dearth's testimony based on respondent's records over the circumstantial evidence to the contrary urged by Boyd. Questions of fact, credibility and weight of testimony are primarily for the determination of the Commission, and it is within the province of the Commission to draw reasonable inferences and conclusions from the evidence. (*Steiner v. Industrial Com.* (1984), 101 Ill. 2d 257, 260, 461 N.E.2d 1363, 1364.) The Commission's conclusion that Boyd stopped working in March of 1980 was not contrary to the manifest weight of the evidence.

Boyd further challenges the Commission's conclusion that she had not proved that she had made sufficient efforts to return to work. Such a conclusion required two component conclusions on the Commission's part, one as to what Boyd's efforts to return to work had been and, the other, that those efforts had been insufficient. As to the former, the Commission found that Boyd had not asked respondent if she could return to work or otherwise seek work since the arbitration hearing except for telephoning her union president in September 1980. The Commission did not comment on Boyd's attempts to return to work between March 1980 and the arbitration hearing in September 1980. Boyd contends that the Commission overlooked that she sought to return to work on March 6, 1980, as reflected in Dr. Barnes' letter, and that she made telephone calls which respondent did not return.

■ The Commission did not, in our view, erroneously understate Boyd's efforts to return to work. A statement of intention made to an

examining doctor need not have been viewed as an affirmative attempt to return to work, and the Commission apparently did not view it as such. Regarding Boyd's alleged telephone calls to respondent, her testimony was uncorroborated, and she suggested neither dates, persons spoken to, nor any summary of what was said.

Turning to the second point, the sufficiency of Boyd's efforts to return to work, such a determination is founded upon an inference the Commission is peculiarly entitled to draw from the evidence adduced. As we cannot conclude that Boyd's efforts were sufficient as a matter of law, we must defer to the Commission's determination upon that question.

In summary, we find that the Commission's conclusions that Boyd stopped working in March 1980 and that she did not establish that she had made sufficient efforts to find work thereafter were both supported by the evidence adduced. Boyd has chosen to urge that she was off work long before March of 1980 and has not disputed the Commission's conclusion that no reason was shown for her having left work in March of 1980. In that setting, we next consider whether it was contrary to the manifest weight of the evidence for the Commission to find that there was no evidence in the record establishing that Boyd could not work as a forklift driver or as a checker and labeler due to her injury.

The record amply establishes the industrial uselessness of Boyd's right hand. The Commission did not find otherwise, instead noting the parties' stipulation that Boyd had lost 100% of the use of her right hand. Dr. Schrodt stated that Boyd was restricted to lifting not more than 10-pound objects, and Dearth's testimony established respondent's awareness of this limitation. Dr. Steichen stated that Boyd's condition required that she avoid using the injured hand or working one-handed jobs. Even Dr. Barnes, whose stated opinion appears to be the medical opinion of record most favorable to respondent, did not indicate that the injured hand was of any industrial use or that Boyd could do any work for respondent.

■ In this regard, if claimant's disability is limited in nature so that she is not obviously unemployable, or if there is no medical evidence to support a claim of total disability, the burden is upon the claimant to establish the unavailability of employment to a person in her circumstances. However, once the employee has initially established that she falls into what has been termed the "odd-lot" category (one who, although not altogether incapacitated for work, is so handicapped that she will not be employed regularly in any well-known branch of the labor market), then the burden shifts to the employer to

show that some kind of suitable work is regularly and continuously available to the claimant. (*Ceco Corp. v. Industrial Com.* (1983), 95 Ill. 2d 278, 287, 447 N.E.2d 842, 845-46.) In light of the evidence in the case at bar concerning Boyd's age, education, and experience, we are of the opinion that the stipulated extent of her injuries was sufficient evidence that she was not obviously employable, *i.e.*, that she had made out a *prima facie* case that she fell into the odd-lot category (see *Valley Mould & Iron Co. v. Industrial Com.* (1981), 84 Ill. 2d 538, 547, 419 N.E.2d 1159, 1163) and that she was unable to perform any but the most menial tasks, for which no stable market exists (*Interlake, Inc. v. Industrial Com.* (1981), 86 Ill. 2d 168, 178, 427 N.E.2d 103, 108). Neither the parties nor the Commission even considered any possible employment for Boyd other than as a forklift driver or checker and labeler. Dearth testified that either job was available and that Boyd could work for respondent within her restrictions if she requested a job and had a doctor's release; however, Harper, the union president, testified that forklift driving was not a one-handed job, and Dearth admitted that the job could involve restacking loads and that labelers had to do some lifting as well.

■ Based on the foregoing evidence, we conclude that the Commission's finding that Boyd had failed to establish her inability to work as either a forklift driver or a checker and labeler was contrary to the manifest weight of the evidence. Boyd's inability to work using her right hand was conclusively established; her inability to work a one-handed job was shown by credible, uncontradicted evidence. We conclude that Boyd has shown her entitlement to benefits for permanent and total disability.

For the foregoing reasons, we affirm the judgment of the circuit court of Macon County confirming the finding of the Industrial Commission that petitioner had lost 100% of the use of her right hand; however, we reverse that portion of such judgment confirming the Industrial Commission's finding that petitioner was not permanently totally disabled. This cause is remanded to the Industrial Commission for determination of benefits.

Affirmed in part and reversed in part and remanded.

SEIDENFELD, P.J., BARRY, McNAMARA, and WEBBER, JJ.