WESTIN HOTEL, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Theodoros Vakalidis, Appellee).

First District (Illinois Workers' Compensation Commission Division) No. 1—06—1728WC

Opinion filed March 27, 2007.

Maciorowski, Sackmann & Ulrich, of Chicago, for appellant.

Shapiro & Vasilatos, of Chicago, for appellee.

JUSTICE GROMETER delivered the opinion of the court:

Claimant, Theodoros Vakalidis, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 1998)) for injuries sustained while in the employ of respondent, Westin Hotel. An arbitrator concluded that claimant's injuries arose out of and in the course of his employment. As such, the arbitrator awarded claimant temporary total disability (TTD) benefits of $672.25 per week for 206²/₇ weeks (see 820 ILCS 305/8(b) (West 1998)), permanent total disability (PTD) benefits of $672.25 per week thereafter for life (see 820 ILCS 305/8(f) (West 1998)), and medical expenses in the amount of $7,112.83 (see 820 ILCS 305/8(a) (West 1998)). The Industrial Commission (Commission)[1] modified the average weekly wage used to calculate claimant's TTD and PTD benefits and reduced the period of TTD benefits, but otherwise affirmed the arbitrator's decision. On judicial review, the circuit court of Cook County further reduced the average weekly wage used to calculate claimant's TTD and PTD benefits, but otherwise confirmed. Respondent now appeals, arguing that the admission of a medical report authored by its independent medical expert was hearsay and should not have been considered. In addition, respondent challenges the Commission's findings with respect to causal connection, the duration of TTD benefits, entitlement to PTD benefits, and medical expenses.

## I. BACKGROUND

Claimant began working as a painter for respondent, a hotelier, in 1995, although his employment was not continuous. Each day, claimant would "take care" of eight or nine guest rooms at the hotel. Claimant's duties also entailed painting the hotel's kitchens, offices, party rooms, and garages. Claimant's position required him to lift a four-foot ladder, five-gallon paint cans, and other painting equipment. Claimant alleged that he was injured on October 5, 1998, when he attempted to prevent a supply cart from tipping over. A hearing before an arbitrator on claimant's application for adjustment of claim commenced on March 2, 2004.

---

[1]Now known as the Illinois Workers' Compensation Commission. See Pub. Act 93—721, eff. January 1, 2005.

At the hearing, claimant testified regarding the circumstances surrounding his injuries. Claimant explained that on the afternoon of October 5, 1998, he was pushing a cart loaded with paint supplies. Claimant estimated that the cart weighed between 140 and 150 pounds. One of the cart's wheels dropped about six inches off a sidewalk, causing the cart to roll out of control. In an attempt to restrain the cart, claimant leaned forward, causing his knee to hit the ground, his body to "tense[ ]" and his back to "shock[ ]." Claimant testified that, at the time of the accident, the pain he felt was not "severe," but that he did experience a "crack" to his lower back and pain to the left knee. Claimant also testified that a few days after the accident, he began experiencing "cutting" and seizure-like sensations to the knee.

Claimant returned to work the day following the accident. At 9 a.m. on October 6, 1998, claimant decided to leave work due to pain. Prior to leaving, claimant reported the accident to a secretary in respondent's engineering department. Although claimant did not remember the secretary's name, he did recall telling her that he was injured and that he needed to see a doctor. Claimant denied ever injuring his lower back or his left knee prior to October 5, 1998.

Claimant initially sought medical treatment from Dr. Joseph Giokaris, on October 6, 1998. Claimant told Dr. Giokaris that he was injured at work the previous afternoon while pushing a supply cart that began to tip over. Claimant complained of lower back pain radiating to both thighs. Upon examination, Dr. Giokaris noted tenderness, muscle spasms, and limitation of movement of the lumbar spine and both legs. Dr. Giokaris diagnosed claimant with a lumbar spine strain, bilateral sciatica, and disc herniation. Dr. Giokaris prescribed medications, physical therapy, rest, and a CT scan of the lower back. A few days after the initial visit, claimant told Dr. Giokaris that he had also injured his knee. In response, Dr. Giokaris ordered an MRI of claimant's left knee. In addition, Dr. Giokaris referred claimant to Dr. James Hill, an orthopaedic specialist. The CT scan of claimant's back was performed on October 6, 1998, while the MRI of the left knee was taken on October 21, 1998.

Dr. Hill first saw claimant on November 16, 1998. During the initial examination, claimant provided a history of injury occurring on October 5, 1998, while he pushed a cart, stating that the cart twisted and he injured his back. Dr. Hill noted that claimant's CT scan revealed a focal herniated disc at L4-L5 and L5-S1 and that the MRI of claimant's left knee suggested a tear of the posterior horn of the medial meniscus. Dr. Hill recommended a program of physical therapy. During later visits with Dr. Hill, claimant's complaints of pain

persisted. As a result, Dr. Hill referred claimant for epidural steroid injections and, subsequently, to Dr. Giri Gireesan, a spinal surgeon.

Early in January 1999, claimant visited Dr. Robert Molloy for the recommended epidural injections. Claimant told Dr. Molloy that he began experiencing low back pain with radiation to the lower extremities following a fall at work in October 1998. Dr. Molloy noted that claimant's diagnostic films showed a herniated disc at L4-L5 and L5-S1. Based on claimant's history, Dr. Molloy administered an epidural steroid injection and instructed claimant to follow up with him in three weeks. On January 28, 1999, claimant returned to Dr. Molloy and reported less than 10% relief of his back pain following the epidural injection. Despite claimant's report of little relief, Dr. Molloy recommended a second injection. Claimant initially declined the second injection. However, at Dr. Hill's urging, claimant returned to Dr. Molloy on February 3, 1999. At that time, claimant continued to complain of low back pain with radiation into both lower extremities. Dr. Molloy's examination revealed muscular type of pulling discomfort with lumbar spine range of motion in all directions. Dr. Molloy also reported diffuse muscle weakness in all muscles of both lower extremities. Based on claimant's symptoms, the examination findings, and Dr. Hill's suggestion, Dr. Molloy administered a second epidural injection to claimant.

Dr. Gireesan first examined claimant in March 1999. Claimant told Dr. Gireesan that, as a result of a work-related injury, he was experiencing severe lower back pain as well as occasional cold sensation in both thighs. Dr. Gireesan reviewed claimant's CT scan, noting a diffused bulging disc at the L4 level. He also ordered an MRI of claimant's lumbosacral spine area and issued an "off work" slip. Claimant returned to Dr. Gireesan's office on May 11, 1999, with continued complaints of severe pain in the back area. Upon reviewing claimant's MRI, Dr. Gireesan diagnosed a bulging disc at the L4-L5 level with somewhat of a central protrusion. Dr. Gireesan opined that claimant's injury was the result of a work-related injury. Dr. Gireesan recommended claimant undergo a lumbar discography followed by interbody fusion. Claimant asked Dr. Gireesan to discuss these treatment options with Dr. Giokaris so that he could have a meaningful conversation and select a treatment plan. Ultimately, claimant declined the surgery recommended by Dr. Gireesan because he was afraid to undergo the procedure.

Claimant continued to treat with Dr. Hill regularly between December 1998 and May 1999. During this time, claimant consistently complained of low back pain with radiation to his left leg, and Dr. Hill's impression was a lumbar herniated disc of L4-L5 and L5-S1 and

a torn left medial meniscus. Beginning in July 1999, claimant reported ongoing back pain, but denied any major radiation of pain to his lower extremity. At that time, Dr. Hill referred claimant to Dr. Michael Haak for another opinion regarding surgical intervention. In a letter dated October 25, 1999, Dr. Hill informed claimant's attorney that claimant would be unable to perform any job activity that required prolonged standing, squatting, kneeling, bending, climbing, prolonged walking, or heavy lifting greater than 25 pounds. Claimant continued to report low back pain through June 28, 2001. Dr. Hill's impression was lumbar herniated nucleus pulposus, and he referred claimant to Dr. Steven Mardjetko to assess the possibility of surgical intervention. Throughout this period, Dr. Hill encouraged claimant to develop a home-exercise program.

Dr. Mardjetko examined claimant on July 23, 2001. Claimant informed Dr. Mardjetko that he was injured at work in October 1998, when he attempted to prevent a heavy cart from tipping over. In particular, claimant reported experiencing back pain and left leg pain immediately after the incident. Dr. Mardjetko diagnosed claimant with degenerative disc disease and spinal stenosis of the lumbar spine. Dr. Mardjetko recommended physical therapy and an MRI of the lumbar spine to evaluate the presence of any nerve compression. Claimant followed up with Dr. Mardjetko on August 20, 2001. Dr. Mardjetko noted that despite a month of physical therapy, claimant had not reported any significant relief of his symptoms and continued to complain of low back pain radiating down the legs. The results of the MRI revealed mild degenerative joint disease at L5 causing some central spinal stenosis at L5 and L3-L4. Based on these findings, Dr. Mardjetko prescribed a series of three epidural injections. Claimant visited Dr. Mardjetko again on October 1, 2001. Dr. Mardjetko noted that claimant had one epidural steroid injection, which had not substantially alleviated his symptoms. Dr. Mardjetko recommended that claimant continue his rehabilitation program as needed with no further appointments unless his condition changed.

Meanwhile, claimant continued to treat with Dr. Hill between August 2001 and January 29, 2004. During this time, claimant's reports of low back pain persisted. In a letter to claimant's attorney dated September 20, 2002, Dr. Hill opined that claimant had reached maximum medical improvement (MMI) as "his condition has not changed over the past year." In the same letter, Dr. Hill opined that claimant's herniated lumbar disc and his torn meniscus were the result of claimant's work accident of October 5, 1998, and that all medical treatment claimant had received through September 20, 2002, was necessary and reasonable. In support of these findings, Dr. Hill

noted that claimant had no complaints prior to the date of the accident but had complaints directly related to his low back and knee following the accident. In concluding, Dr. Hill wrote that claimant was totally disabled from his job and he reiterated his earlier finding that claimant could not perform any position that required any prolonged standing or walking, squatting, kneeling, bending, or climbing, or heavy lifting greater than 25 pounds.

While claimant was being treated for his back and knee conditions, Dr. Hill, respondent, and claimant's own attorney referred him to various examining physicians. Dr. Hill referred claimant to Dr. David Spencer, who examined claimant on May 20, 1999. At that time, claimant reported a history of low back pain. Dr. Spencer noted that although traditional surgery had been recommended, claimant's visit with him was to determine whether microdiscectomy surgery was a possibility. Following the examination, Dr. Spencer opined that claimant was not a candidate for the surgery because he did not have signs and symptoms of nerve root tension due to a disc herniation. Dr. Spencer concluded that the optimal course for claimant would be symptomatic treatment only with oral nonsteroidal anti-inflamatory and analgesic medications and activity as tolerated.

Respondent referred claimant to Dr. Avi Bernstein, an associate of Dr. Spencer. Dr. Bernstein, who also examined claimant on May 20, 1999, noted that claimant did not have any real sciatic pain, but complained predominantly of pain in his back with some nonspecific leg symptoms. Dr. Bernstein also noted that claimant did not believe that he could return to his job as a painter and that he wanted minimally invasive surgery to relieve his symptoms. Dr. Bernstein reviewed claimant's diagnostic films, finding that claimant suffered from diffuse bulging at the L4-L5 disc with degeneration. Dr. Bernstein concluded that claimant was not a surgical candidate and that the appropriate treatment for claimant would be continued activity as tolerated with symptomatic treatment only.

On May 10, 2000, claimant visited Dr. Mark Levin at respondent's request. Dr. Levin's report of the visit revealed the following. Claimant told Dr. Levin that he injured his back and left knee at work in October 1998. In particular, claimant reported pushing a cart full of paint supplies when one of the wheels fell by the sidewalk of the loading dock. Claimant's injuries occurred as he tried to prevent the cart from tipping over. Dr. Levin performed a physical examination of claimant and reviewed some of the diagnostic films ordered by other physicians. Based on claimant's history, the physical examination, and medical records, Dr. Levin recommended an EMG of the lower extremities to determine whether there is a radicular component to claimant's

complaint or whether plaintiff suffers from mechanical back pain. Dr. Levin wrote that if the EMG is negative for a radicular component, immobilization may provide claimant improvement with his low back discomfort. Dr. Levin indicated that if claimant's back improved within six weeks to three months of immobilization, he would recommend a lumbar fusion for mechanical low back pain. Dr. Levin also wrote that if the EMG showed nerve impingement, he would be concerned about whether the discs that are seen bulging on claimant's diagnostic films are causing the impingement. Dr. Levin stated that whether claimant is a candidate for a laminectomy or a discectomy would depend on the results of the EMG.

With respect to claimant's knee injury, Dr. Levin found no objective pathology and no meniscal pain based on claimant's clinical examination. Dr. Levin expressed his willingness to review the MRI of claimant's left knee, but he did not feel that claimant's left knee required any treatment. Dr. Levin concluded his report by stating that because of claimant's "marked subjective discomfort," claimant appears to be unable to carry out functional work activities. Respondent objected to the introduction of Dr. Levin's report on the basis of hearsay. The arbitrator overruled respondent's objection and allowed the report into evidence.

On May 3, 2001, respondent referred claimant to Dr. Gunnar Andersson, an orthopaedic surgeon. Dr. Andersson noted a history of injury occurring while claimant was pushing a supply cart and one of the wheels of the cart fell off the loading dock, causing claimant to fall to his knees in an attempt to prevent the cart from falling over. A physical examination of claimant was normal except for a decreased range of motion which Dr. Andersson described as "very non-specific and subjectively influenced by the patient." After reviewing claimant's medical history, Dr. Andersson did not feel that claimant's symptoms were entirely related to the alleged work accident. In particular, Dr. Andersson noted a period of eight months during which claimant did not require any treatment and, therefore, "for all practical purposes must be considered as having improved." Dr. Andersson opined that claimant's underlying back problem was degenerative and was not related to work. Dr. Andersson did believe, however, that claimant had a "mechanically sensitive back" and would do better being restricted in work to a medium level. Finally, Dr. Andersson opined that claimant's knee injury "could possibly been [sic] caused by the accident and the knee treatment should be seen as related." On cross-examination, Dr. Andersson stated that when diagnosing the need for surgery, he personally reviews the patient's diagnostic films and that he "would not take anybody to the operating room without looking at

the films." In claimant's case, Dr. Andersson admitted that he only reviewed the reports of the diagnostic films and not the actual films themselves.

Finally, on February 18, 2003, claimant's attorney referred him to a specialist in occupational medicine, Dr. Jeffery Coe. Dr. Coe noted a history of injury occurring on October 5, 1998, as claimant pushed a cart when one of the cart's wheels fell as he moved onto a loading dock. Claimant attempted to prevent the cart from tipping over when he "fell to his knees and noted an immediate sharp pain in his lower back and left knee." Upon examination, Dr. Coe noted stiffness of claimant's back. Palpitations to the back revealed certain tender areas with lumbar spine flexion less than normal. With respect to claimant's left knee, the only abnormalities observed by Dr. Coe were some mild stiffness and some cracking, popping, and crunching sounds from the joint. Dr. Coe opined that claimant's injuries were related to his October 5, 1998, accident. Dr. Coe's diagnosis was (1) degenerative disc disease and degenerative arthritis of the lumbar spine with symptomatic protrusion of the L4-L5 intervertebral disc causing some acute and chronic symptoms of spinal stenosis and (2) a tear of the medial meniscus of the left knee. Dr. Coe found that claimant's conditions were aggravated and accelerated by his work-related accident of October 5, 1998. Dr. Coe opined to a reasonable degree of medical certainty that claimant was permanently disabled from gainful employment in any type of competitive marketplace because of his spine and leg injuries. Dr. Coe testified that his finding of permanent disability was based on claimant's limited proficiency of English, age, educational background, and career background, which was limited to a 30-year career in industrial painting. Dr. Coe also emphasized that claimant's limited knowledge of the English language would make it difficult for him to be retrained in a different occupation.

Claimant also testified at the arbitration hearing that he was born in Greece in September 1944. While living in Greece, claimant attended elementary school for six years, until the age of 12. At age 18, claimant went to painting school for one year. Claimant worked as a painter in Greece and Germany before moving to Chicago in the fall of 1982. Claimant testified that he worked for various painting companies prior to obtaining a position with respondent. Claimant stated that he never received any education or schooling in the United States, that Greek is his native tongue, and that he has never taken any classes to learn English. However, he stated that he understands "a few things" in English. On cross-examination, claimant admitted that he continued to work for respondent after the accident until November 9, 1998.

Based on the foregoing evidence, the arbitrator concluded that

claimant suffered a work-related accident on October 5, 1998, that claimant gave timely notice of the accident to respondent, and that claimant's condition of ill-being was causally connected to that accident. The arbitrator awarded claimant TTD benefits from November 9, 1998, through October 22, 2002. The arbitrator also determined that claimant was permanently and totally disabled under the "odd lot" theory. As such, the arbitrator awarded claimant PTD benefits for life beginning October 23, 2002. The arbitrator calculated claimant's average weekly wage as $1,008.38, and his TTD and PTD rate at $672.25. In addition, the arbitrator awarded claimant medical expenses in the amount of $7,112.83.

The Commission affirmed in part and modified in part. The Commission calculated claimant's average weekly wage to be $1,007.25. The Commission also found that claimant was temporarily totally disabled only from November 9, 1998, through September 20, 2002, the date of Dr. Hill's letter indicating that claimant had reached MMI, but that his permanent total disability began on September 21, 2002. The Commission otherwise affirmed. On appeal, the circuit court of Cook County determined that, pursuant to *Greaney v. Industrial Comm'n*, 358 Ill. App. 3d 1002 (2005), the arbitrator erroneously admitted the report of Dr. Levin. However, the court found the error harmless in light of other medical evidence. The trial court also reduced claimant's average weekly wage to $998.88, resulting in a TTD and PTD rate of $659.26. The circuit court otherwise confirmed. Respondent now appeals.

## II. ANALYSIS

### A. Admission of Dr. Levin's Report

On appeal, respondent first argues that the erroneous admission of Dr. Levin's hearsay report was not harmless. Respondent claims that the Commission relied on Dr. Levin's report when it addressed the issue of causation, and it urges this court to remand the case to the Commission for reconsideration without Dr. Levin's report. Claimant responds that the admission of Dr. Levin's report was harmless error and did not prejudice respondent since there was other sufficient competent evidence to support the Commission's decision. We agree that while the admission of Dr. Levin's report was error, it was harmless.

In *Greaney*, 358 Ill. App. 3d at 1010-11, we held that a party's independent medical expert is not *per se* an agent of the party who hired him or her, and, therefore, the expert's opinions are not admissible as admissions against that party's interest. In this case, therefore, the fact that Dr. Levin was retained by respondent did not render his

report admissible as an admission against respondent's interest. However, we note that not every admission of incompetent evidence requires reversal. *Greaney*, 358 Ill. App. 3d at 1013. In *Greaney*, we pointed out that when an examination of the record as a whole demonstrates that the erroneously admitted evidence is cumulative and does not otherwise prejudice the objecting party, error in its admission is harmless. *Greaney*, 358 Ill. App. 3d at 1013. After reviewing the record in this case, we conclude that the Commission's finding as to causation was sufficiently supported by other competent evidence so as to render the admission of Dr. Levin's report harmless.

Specifically, and as discussed more thoroughly below, Dr. Hill, an orthopaedic specialist who treated claimant over a course of several years, initially diagnosed claimant with a focal herniated disc at L4-L5 and L5-S1 and a tear of the posterior horn of the medial meniscus. In a letter dated September 20, 2002, Dr. Hill opined that claimant's back and knee injuries were the result of his work accident of October 5, 1998. At that time, Dr. Hill pointed out that claimant had no complaints prior to the date of the accident but had complaints directly related to his low back and knee following the accident. Dr. Hill opined that claimant was totally disabled from his job and that he would be unable to perform any position that required any prolonged standing or walking, squatting, kneeling, bending, climbing, or heavy lifting greater than 25 pounds. After reviewing several diagnostic tools, Dr. Gireesan reached a similar diagnosis and concluded that claimant's back injury was work related. Furthermore, Dr. Coe diagnosed claimant with degenerative disc disease and degenerative arthritis of the lumbar spine with symptomatic protrusion of the L4-L5 intervertebral disc causing some acute and chronic symptoms of spinal stenosis and a tear of the medial meniscus of the left knee. According to Dr. Coe, these injuries were related to claimant's October 5, 1998, accident. Accordingly, we conclude that even absent Dr. Levin's report, the Commission's findings were sufficiently supported by the competent evidence of other physicians involved in this case.

Notwithstanding the evidence cited above, respondent argues that in adopting the arbitrator's decision, the Commission relied on Dr. Levin's report to "tip the balance" between conflicting medical opinions on causation. A close examination of the arbitrator's decision suggests that the arbitrator did not place as much emphasis on Dr. Levin's report as respondent claims.

The Commission's decision does not reference Dr. Levin's report *per se*. However, its decision adopted, as modified, the decision of the arbitrator. In his decision, the arbitrator "[found] support in *both* the treating records *and* Respondent's IME opinion of Dr. Levin that

[claimant's] condition of ill-being is causally connected to the work injury of October 5, 1998." (Emphasis added.) Clearly, this passage suggests that Dr. Levin's report was not the only evidence showing a causal connection between claimant's work-related injury of October 5, 1998, and his condition of ill-being. In fact, the arbitrator extensively cited the opinions of Drs. Hill and Gireesan in support of his finding of causal connection. The only contrary evidence cited by the arbitrator came from one of respondent's independent medical experts, Dr. Andersson. The arbitrator discredited Dr. Andersson's opinion because he admitted that while he personally reviews diagnostic films before performing surgery on his patients, he never personally reviewed claimant's diagnostic films. Thus, we find that the admission of Dr. Levin's report was cumulative and did not prejudice respondent.

Respondent also points out that the arbitrator stated in his decision that "the most compelling evidence against Respondent's denial on causal connection is the difference of opinions between Respondent's two examining physicians, Dr. Levin and Dr. Andersson." According to respondent, this passage also militates against a finding that reliance on Dr. Levin's report was not harmless. However, respondent again overemphasizes an isolated portion of the arbitrator's decision. The purpose of this language was merely to stress that respondent's independent medical experts themselves could not agree as to the cause of claimant's lower back condition. However, even without Dr. Levin's report, the fact remains that Drs. Hill, Gireesan, and Coe were unequivocal that claimant's condition of ill-being was causally connected to his work-related accident of October 5, 1998. As such, we find that even without Dr. Levin's report, the Commission would have reached the same conclusion regarding causation.

## B. Causal Connection

Next, respondent argues that, even without Dr. Levin's report, the Commission's decision regarding causal connection is against the manifest weight of the evidence with respect to both claimant's low back condition and his injury to the left knee. Whether a causal connection exists between a claimant's condition of ill-being and his work-related accident is a question of fact to be resolved by the Commission. *University of Illinois v. Industrial Comm'n*, 365 Ill. App. 3d 906, 913 (2006). As such, we will not disturb the Commission's decision on review unless it is against the manifest weight of the evidence. *University of Illinois*, 365 Ill. App. 3d at 913. It is within the province of the Commission to resolve conflicts in the evidence, especially as they relate to medical opinion evidence. *Bernardoni v. Industrial Comm'n*, 362 Ill. App. 3d 582, 597 (2005). The relevant inquiry is whether the

evidence is sufficient to support the Commission's finding, not whether this court or any other might reach an opposite conclusion. *Bernardoni*, 362 Ill. App. 3d at 597. For the Commission's decision to be against the manifest weight of the evidence, the opposite conclusion must be clearly apparent. *Swartz v. Industrial Comm'n*, 359 Ill. App. 3d 1083, 1086 (2005). With these principles in mind, we address each of claimant's injuries separately.

### 1. Back Injury

■ Respondent argues that the Commission's finding of a causal connection between the October 5, 1998, accident and claimant's low back condition is against the manifest weight of the evidence. In support of its argument, respondent advances several claims. First, respondent points to evidence that claimant suffered a prior injury to his low back following a January 1995 automobile accident. Second, respondent points out that claimant continued to work without restrictions for over one month after the accident occurred. Finally, respondent claims that the medical evidence is insufficient to support a finding of causal connection between claimant's injury to his low back and the accident of October 5, 1998. We find all three arguments unpersuasive.

Respondent alleged at the arbitration hearing that claimant was involved in an automobile accident in January 1995, resulting in a back injury. Claimant admitted that he was once involved in a rear-end collision which required X rays "for preventative reasons," but he could not recall the exact date. Thus, the Commission was aware of these allegations. However, it was within the province of the Commission to conclude that any injury sustained as a result of the January 1995 automobile accident resolved itself prior to the October 1998 incident, especially given claimant's testimony that the X rays were taken for preventative reasons only. We also point out that the Commission was well aware of the fact that claimant continued to work for respondent for over a month after the October 5, 1998, accident, and we assume that the Commission gave this factor due weight in rendering its decision. Furthermore, as set forth below, the medical opinion testimony overwhelmingly supports the Commission's finding that claimant's back injury was causally connected to his work-related accident of October 5, 1998.

The medical evidence, in particular the opinions of Drs. Hill, Gireesan, and Coe, clearly supports the Commission's finding of a causal connection between claimant's low back injury and the work-related accident of October 5, 1998. As noted, claimant was first treated the day following the accident by Dr. Giokaris. At that time,

claimant reported lower back pain. Claimant testified that prior to the accident he experienced no such pain. Following an examination, which revealed tenderness, muscle spasms, and limitation of movement of the lumbar spine and both legs, Dr. Giokaris diagnosed claimant with a lumbar spine strain, bilateral sciatica, and disc herniation. Among other things, Dr. Giokaris recommended a CT scan of the lower back and referred claimant to Dr. Hill, an orthopaedic specialist. The CT scan was performed the same day. Dr. Hill noted that claimant's CT scan revealed a focal herniated disc at L4-L5 and L5-S1. Dr. Hill opined that the cause of claimant's back injury was the work accident of October 5, 1998, because claimant had no problems prior to that time but had complaints directly related to his low back following the accident. In addition, Dr. Hill pointed out that claimant's injury was supported by the CT scan, an objective diagnostic tool. Dr. Gireesan read claimant's CT scan and noted a diffused bulging disc at the L4 level. Dr. Gireesan ordered an MRI of claimant's lumbosacral spine area, which confirmed his initial impression. Dr. Gireesan agreed with Dr. Hill that claimant's injury was the result of a work-related injury. Claimant's independent medical expert, Dr. Coe, diagnosed degenerative disc disease and degenerative arthritis of the lumbar spine with symptomatic protrusion of the L4-L5 intervertebral disc causing some acute and chronic symptoms of spinal stenosis. Dr. Coe also found that claimant's conditions were aggravated and accelerated by his work-related accident of October 5, 1998.

Respondent's independent medical expert, Dr. Andersson, did not agree with the opinions of Drs. Hill, Gireesan, and Coe regarding the relationship between claimant's back injury and the accident of October 5, 1998. However, Dr. Andersson did not review claimant's diagnostic films. Furthermore, he indicated that he would never operate on anyone without looking first at the diagnostic films. Based on this acknowledgment, it was within the province of the Commission to discount Dr. Andersson's opinion. In sum, based on the foregoing evidence, a conclusion opposite to that reached by the Commission is not clearly apparent. As a result, we find that the Commission's finding of a causal connection between claimant's back injury and his work accident of October 5, 1998, was not against the manifest weight of the evidence.

### 2. Knee Injury

■ Respondent also insists that claimant's position that he sustained an injury to his left knee on October 5, 1998, is not supported by an accident report filed with respondent, a contemporaneous history of injury to the treating physicians, or by his testimony at the arbitration hearing.

With respect to the issue whether claimant reported an injury to respondent, claimant testified at the arbitration hearing that he reported the work accident to the secretary in the engineering department at 9 a.m. on the day following the accident. Claimant told the secretary that he was injured and that he needed to see a doctor. Oral notice is sufficient under the notice provision of the Act (820 ILCS 305/6(c) (West 1998)); see also *Cook v. Industrial Comm'n*, 176 Ill. App. 3d 545, 550 (1988) (finding that telephonic notice three days after accident was sufficient), and respondent presented no evidence to contradict claimant's testimony that he provided such notice. Moreover, even if we were to consider claimant's notice to petitioner defective, respondent has failed to show how it was prejudiced. See 820 ILCS 305/6(c) (West 1998) ("No defect or inaccuracy of such notice shall be a bar to the maintenance of proceedings on arbitration or otherwise by the employee unless the employer proves that he is unduly prejudiced in such proceedings by such defect or inaccuracy"); *Gano Electric Contracting v. Industrial Comm'n*, 260 Ill. App. 3d 92, 96 (1994) (noting that because the legislature has mandated a liberal construction on the issue of notice, an employee's claim will be barred only if no notice whatsoever has been given).

Moreover, contrary to respondent's claim, a review of claimant's medical history and the testimony at the arbitration hearing supports the Commission's finding of a causal connection between claimant's knee injury and his accident of October 5, 1998. Although claimant did not elaborate on the type of injury he reported to the secretary, he did visit Dr. Giokaris the same day. At that time, claimant complained of lower back pain and leg pain. A few days after this initial visit, claimant complained to Dr. Giokaris about his knee. At Dr. Giokaris's recommendation, claimant subsequently underwent an MRI of his left knee on October 21, 1998. Dr. Giokaris later referred claimant to Dr. Hill. During claimant's initial visit with Dr. Hill, claimant reported some left knee pain. Dr. Hill reviewed claimant's MRI, and his impression was a possible torn left medial meniscus. Claimant continued to experience discomfort of the left knee, and, following a visit in December 1998, Dr. Hill confirmed his diagnosis of a tear of the left medial meniscus. Dr. Hill opined that claimant's knee injury was causally connected to his work injury of October 5, 1998. In fact, Dr. Hill was not the only physician who shared this opinion. Dr. Coe, claimant's independent medical expert, also examined claimant. Dr. Coe noted that the flexion of claimant's left knee was only 130 degrees compared to the normal 140 degrees. Dr. Coe also noted complaints of left knee pain with the range-of-motion test as well as some cracking, popping, and crunching noises of claimant's knee joints. Based on this examina-

tion, Dr. Coe corroborated Dr. Hill's finding that claimant had a tear of the medial meniscus of the left knee and that his injury was related to his work accident of October 5, 1998. For his part, Dr. Andersson, respondent's independent medical expert, opined that claimant's knee injury "could [have] possibly been caused by the accident" and that it "should be seen as related." Clearly, this evidence overwhelmingly supports the Commission's finding of a causal connection between claimant's knee injury and his accident of October 5, 1998. Consequently, we do not find the Commission's finding to be against the manifest weight of the evidence.

## C. Period of Temporary Total Disability

■ Respondent next argues that the Commission's finding that claimant was entitled to TTD benefits from November 9, 1998, through September 20, 2002, was against the manifest weight of the evidence. According to respondent, Dr. Hill's medical records show that claimant's condition remained unchanged after February and March 1999. Thus, respondent asserts, claimant reached MMI by March 5, 1999.

A claimant is temporarily totally disabled from the time an injury incapacitates him from work until such time as he is as far recovered or restored as the permanent character of his injury will permit. *Gallianetti v. Industrial Comm'n*, 315 Ill. App. 3d 721, 732-33 (2000). The dispositive inquiry is whether the claimant's condition has stabilized, that is, whether the claimant has reached MMI. *Nascote Industries v. Industrial Comm'n*, 353 Ill. App. 3d 1067, 1072 (2004). In determining whether a claimant has reached MMI, a court may consider factors such as a release to return to work, medical testimony or evidence concerning the claimant's injury, the extent of the injury, and, most importantly, whether the injury has stabilized. *Mechanical Devices v. Industrial Comm'n*, 344 Ill. App. 3d 752, 760 (2003). Once an injured claimant has reached MMI, the disabling condition has become permanent and he is no longer eligible for TTD benefits. *Nascote Industries*, 353 Ill. App. 3d at 1072. The period during which a claimant is temporarily totally disabled is a factual determination. *Gallianetti*, 315 Ill. App. 3d at 733. Accordingly, the Commission's decision regarding the period of TTD will not be disturbed on review unless it is against the manifest weight of the evidence. *Nascote Industries*, 353 Ill. App. 3d at 1072.

In finding that claimant had reached MMI by September 20, 2002, the Commission relied on a letter from Dr. Hill to claimant's attorney. The record supports the Commission's determination. In particular, we note that while the course of treatment administered by Dr. Hill

remained essentially unchanged after March 1999, claimant consulted with other physicians in an attempt to relieve his injuries. For instance, following claimant's March 1999 visit, Dr. Hill referred claimant to Dr. Gireesan, a spinal surgeon, regarding surgical intervention. In May and July 1999, Dr. Hill referred claimant to other surgeons for assessments. The evidence also suggests that Dr. Hill believed that there was hope for improvement as late as mid-2001, when he referred claimant for treatment to Dr. Mardjetko. Dr. Mardjetko hoped that a series of epidural injections would improve claimant's back condition. We note further that during the time period between claimant's accident and September 2002, claimant participated in more conservative treatment such as physical therapy and home exercise. It was not until September 2002 that Dr. Hill opined that claimant reached MMI.

Furthermore, there was no evidence that claimant was physically able to return to work during the period from November 1998 through September 2002. In fact, the record contains a letter from Dr. Hill dated October 25, 1999, informing claimant's attorney that claimant would be unable to perform any job activity that required prolonged standing, squatting, kneeling, bending, climbing, prolonged walking, or heavy lifting greater than 25 pounds. Even respondent's independent medical expert, Dr. Andersson, suggested that respondent could not return to his position as a painter. According to Dr. Andersson, claimant should be subject to "medium restrictions" which he described as "50 pounds occasionally and 25 pounds repetitively." There was no evidence in the record that respondent offered claimant a position within any of these restrictions. Indeed, claimant testified that respondent never contacted him about returning to work. In sum, based on the evidence, we find that the Commission could reasonably have found that claimant had not reached MMI until September 20, 2002. The Commission's finding was not against the manifest weight of the evidence.

### D. "Odd Lot" Status

■ Respondent next challenges the Commission's determination that claimant satisfied his burden of showing "odd lot" permanent disability status. The arbitrator found claimant permanently and totally disabled under the "odd lot" category based on claimant's age, limited vocational training and work experience, minimal formal education, and limited English-language skills. The arbitrator cited the testimony of Dr. Coe. Dr. Coe noted that claimant had worked as a painter for 30 years and opined that claimant would have to be retrained if he were to work in another field. Dr. Coe believed that claimant's limited English skills would hamper any retraining efforts.

Dr. Coe added that claimant would have difficulty finding employment in any type of competitive marketplace because of the condition of his back and legs, his limited knowledge of English, his age and educational background, and his limited work experience. The Commission adopted the arbitrator's finding without comment.

An employee is totally and permanently disabled when he is unable to make some contribution to industry sufficient to justify payment of wages to him. *A.M.T.C. of Illinois, Inc., Aero Mayflower Transit Co. v. Industrial Comm'n*, 77 Ill. 2d 482, 487 (1979). However, the employee need not be reduced to total physical incapacity before a permanent total disability award may be granted. *Ceco Corp. v. Industrial Comm'n*, 95 Ill. 2d 278, 286 (1983). Rather, the employee must show that he is unable to perform services except those that are so limited in quantity, dependability, or quality that there is no reasonably stable market for them. *Alano v. Industrial Comm'n*, 282 Ill. App. 3d 531, 534 (1996). If the claimant's disability is limited in nature so that he is not obviously unemployable, or if there is no medical evidence to support a claim of total disability, the burden is upon the claimant to prove by a preponderance of the evidence that he fits into the "odd lot" category—one who, though not altogether incapacitated to work, is so handicapped that he will not be employed regularly in any well-known branch of the labor market. *Valley Mould & Iron Co. v. Industrial Comm'n*, 84 Ill. 2d 538, 546-47 (1981); *Alexander v. Industrial Comm'n*, 314 Ill. App. 3d 909, 915-16 (2000). The claimant ordinarily satisfies his burden of proving that he falls into the "odd lot" category in one of two ways: (1) by showing diligent but unsuccessful attempts to find work, or (2) by showing that because of his age, skills, training, and work history, he will not be regularly employed in a well-known branch of the labor market. *Alano*, 282 Ill. App. 3d at 534-35. "Whether a claimant falls into the odd-lot category is a factual determination to be made by the Commission, and that determination will not be set aside unless it is against the manifest weight of the evidence." *Alano*, 282 Ill. App. 3d at 538 (Colwell, J., specially concurring). Once the claimant establishes that he falls into the "odd lot" category, the burden shifts to the employer to prove that the claimant is employable in a stable labor market and that such a market exists. *Waldorf Corp. v. Industrial Comm'n*, 303 Ill. App. 3d 477, 484 (1999).

In this case, we conclude that claimant has not carried his burden of establishing by a preponderance of the evidence that he falls into the "odd lot" category. See *Lanter Courier v. Industrial Comm'n*, 282 Ill. App. 3d 1, 6 (1996). Claimant did not present any evidence that he conducted any job search. Moreover, the only witness to testify regard-

ing claimant's unemployability was Dr. Coe, a specialist in occupational medicine. Dr. Coe testified that, to a reasonable degree of medical certainty, claimant is permanently and totally disabled from gainful employment. Dr. Coe's opinion was based on the history he took from claimant, claimant's symptoms, claimant's medical records, and Dr. Coe's physical examination of claimant. However, merely proffering medical evidence of permanency is insufficient to shift the burden to the employer. See *Alano*, 282 Ill. App. 3d at 535. Indeed, the most recent cases making an "odd lot" determination on the basis that there is no stable job market for a person of the claimant's age, skills, training, and work history have required evidence from a rehabilitation services provider or a vocational counselor. See *Reliance Elevator Co. v. Industrial Comm'n*, 309 Ill. App. 3d 987, 992 (1999); *Contour Designs, Inc. v. Industrial Comm'n*, 255 Ill. App. 3d 816, 821 (1994); *City of Green Rock v. Industrial Comm'n*, 255 Ill. App. 3d 895, 901 (1993); *Illinois-Iowa Blacktop, Inc. v. Industrial Comm'n*, 180 Ill. App. 3d 885, 889 (1989); but see *Boyd v. Industrial Comm'n*, 127 Ill. App. 3d 1023, 1029-30 (1984) (relying, among other things, on testimony of union president, but giving no indication of reliance on expert vocational testimony). As far as we can tell, Dr. Coe had not ordered or reviewed any vocational or rehabilitative tests, conducted a labor-market survey on claimant's behalf, attempted to find claimant a position within his restrictions, or prescribed a functional capacity evaluation. In fact, Dr. Coe acknowledged on cross-examination that he never reviewed a job description for claimant's position, that claimant only told him "in general in his limited way" what his job duties entailed, and that he never ordered any vocational evaluation of claimant. Although Dr. Coe emphasized that claimant's limited knowledge of the English language restricted his ability to be rehabilitated in an occupation other than a painter, our supreme court has suggested that one's language skill is insufficient to support a finding of "odd lot." *Valley Mould & Iron Co.*, 84 Ill. 2d at 548. In contrast to Dr. Coe's opinion of unemployability is the testimony of Drs. Hill and Andersson. Dr. Hill testified that claimant was totally disabled from his job as a painter. However, he also stated that claimant could return to a position that did not require any prolonged standing, squatting, kneeling, bending, or climbing, or heavy lifting greater than 25 pounds. In addition, Dr. Andersson opined that claimant could return to medium-level work. In sum, since claimant presented neither evidence of a diligent but unsuccessful job search nor expert vocational testimony regarding the job market for someone of his age, skills, training, and work history, we hold that the Commission's finding that claimant proved "odd lot" permanent disability status was against the manifest weight of the evidence.

Although we disagree with the Commission regarding its finding that claimant falls into the "odd lot" category, we acknowledge evidence in the record suggesting that claimant sustained some level of permanent disability. It is unclear to us, however, whether this disability is properly categorized as permanent partial or permanent total. As a result, we remand this cause to the Commission for a determination on this issue.

## E. Medical Expenses

■ Finally, respondent challenges several medical bills as unreasonable and unnecessary to claimant's treatment. In particular, respondent asserts that (1) $3,520 in medical bills from Dr. Giokaris were "excessive and not reasonable" because the charges related to "numerous and repetitive therapies;" (2) an $850 charge for the October 21, 1998, MRI of plaintiff's left knee should be denied because it was not causally related to the work accident; and (3) a charge for $114.01 from Dr. Mardjetko and one for $43.76 from a doctor who administered lumbar injections are not compensable because the treatment for which these charges were incurred related not to the work accident, but "to the underlying degenerative disc condition."

Under section 8(a) of the Act (820 ILCS 305/8(a) (West 1998)), an employer is required to provide or pay for "all the necessary first aid, medical and surgical services, and all necessary medical, surgical and hospital services thereafter incurred, limited, however, to that which is reasonably required to cure or relieve from the effects of the accidental injury." The claimant bears the burden of proving, by a preponderance of the evidence, his entitlement to an award of medical expenses under section 8(a). *Max Shepard, Inc. v. Industrial Comm'n*, 348 Ill. App. 3d 893, 903 (2004). "Questions as to the reasonableness of medical charges or their causal relationship to a work-related injury are questions of fact to be resolved by the Commission, and its resolution of such matters will not be disturbed on review unless against the manifest weight of the evidence." *Max Shepard, Inc.*, 348 Ill. App. 3d at 903. After reviewing the record, we cannot say that the Commission's decision to award the complained-of medical expenses was against the manifest weight of the evidence.

First, the award of Dr. Giokaris's medical expenses was appropriate since Dr. Giokaris was claimant's initial treating physician and claimant's injuries were causally related to the work accident of October 5, 1998. Second, because the Commission correctly determined that claimant's left-knee injury was causally related to claimant's work accident of October 5, 1998, the charge for the MRI of the left knee was reasonable and necessary. Finally, we reject respondent's

argument that it should not be required to pay the expenses attributable to Dr. Mardjetko and the lumbar injections. These expenses are compensable as the record establishes that Dr. Hill referred claimant to Dr. Mardjetko for treatment of "a lumbar herniated nucleus pulposus" as a result of ongoing pain from the October 5, 1998, accident. Furthermore, in his letter of September 20, 2002, to claimant's attorney, Dr. Hill wrote that all of claimant's medical expenses through the date of the letter were reasonable and necessary. Respondent presented no evidence to contradict Dr. Hill's opinion. As such, the Commission's award of medical expenses in the amount of $7,112.38 was proper.

## III. CONCLUSION

For the foregoing reasons, we reverse that portion of the circuit court's order confirming the finding of the Commission that claimant satisfied his burden of showing "odd lot" permanent disability status and we remand the cause to the Commission for a determination whether claimant is entitled to permanent partial or permanent total disability benefits. We affirm the remainder of the circuit court's decision.

Affirmed in part, reversed in part, and remanded.

McCULLOUGH, P.J., and HOFFMAN and HOLDRIDGE, JJ., concur.

DONOVAN, J., dissenting:

Because I believe the Commission's decision with respect to the permanence of claimant's condition based on his "odd lot" status is supported by the evidence in the record and is not against the manifest weight of that evidence, I must dissent.

An employee is totally and permanently disabled when he or she is unable to make some contribution to the work force sufficient to justify the payment of wages. *Ceco Corp. v. Industrial Comm'n*, 95 Ill. 2d 278, 286, 447 N.E.2d 842, 845 (1983). While the employee need not be reduced to a state of total physical helplessness, he or she will be considered totally disabled when he or she cannot perform any services except those which are so limited in quantity, dependability or quality that there is no reasonably stable market for them. *Max Shepard, Inc. v. Industrial Comm'n*, 348 Ill. App. 3d 893, 901, 810 N.E.2d 54, 61 (2004). A claimant ordinarily satisfies the burden of proving he or she is not capable of obtaining gainful employment by showing that work was not available or that based upon his or her age, experience, train-

ing and education, he or she is unable to perform any but the most unproductive tasks for which no stable labor market exists. *Valley Mould & Iron Co. v. Industrial Comm'n*, 84 Ill. 2d 538, 547, 419 N.E.2d 1159, 1163 (1981); *Illinois-Iowa Blacktop, Inc. v. Industrial Comm'n*, 180 Ill. App. 3d 885, 888-89, 536 N.E.2d 1008, 1011 (1989).

Here, claimant was 59 years old at the time of the arbitration hearing. He does not speak or write English and has had no formal education in the United States. In fact, even his education in his native Greece was limited, ending when he was just 12 years old. His only work in the United States has been as a painter for 30 years. Dr. Hill testified that claimant was totally disabled from his job as a painter and recommended permanent restrictions of no prolonged standing, walking, squatting, kneeling, bending, climbing or lifting anything heavier than 25 pounds. Clearly these restrictions precluded claimant from returning to his employment of painting. Dr. Coe, who has practiced occupational medicine for over 30 years, also testified that claimant was permanently disabled from gainful employment in any type of competitive labor market. He specifically noted claimant's condition of ill-being of his back and legs, his limited English skills, his need to be retrained in another occupation, his absence from the labor market for several years, and his age, another factor detrimental to his employability and retraining. Employer offered no medical evidence to rebut the findings of Dr. Coe. Employer also presented no evidence that it offered claimant light-duty work or that a stable labor market existed for him in light of his permanent restrictions. I too, therefore, would conclude, given the totality of the medical evidence and claimant's unrebutted testimony, that claimant met his burden of proving he fell within the "odd lot" category of permanent total disability. I see no reason, under these circumstances, to overturn the decision of the Commission.

For these reasons, I must dissent.