No. 4-18-0788WC
Order filed November 13, 2019

FILED
November 13, 2019
Carla Bender
4th District Appellate
Court, IL

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FOURTH DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION

_____

| | | |
|---|---|---|
| ETHAN BARNETT, | ) | Appeal from the Circuit Court |
| | ) | of McLean County |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 18-MR-312 |
| | ) | |
| THE ILLINOIS WORKERS' | ) | |
| COMPENSATION COMMISSION, | ) | |
| | ) | Honorable |
| (Diversatech Metal Fab, Inc., | ) | Paul Lawrence, |
| Defendant-Appellee). | ) | Judge, Presiding. |

_____

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice Holdridge and Justices Hoffman, Cavanagh, and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*:    (1) That portion of the circuit court order which confirmed the Commission's award of permanent partial disability benefits to claimant under section 8(d)(2) of the Workers' Compensation Act is reversed, but the circuit court order is affirmed in all other respects; (2) that portion of the Commission's award of permanent partial disability benefits to claimant under section 8(d)(2) of the Workers' Compensation Act is vacated; and (3) the matter is remanded to the Commission with directions to consider whether claimant proved he was permanently and totally disabled under an odd-lot theory by demonstrating because of his age, training, education,

experience, and condition, there are no available jobs for a person in his circumstance.

¶ 2                                    I.  INTRODUCTION

¶ 3     Claimant, Ethan Barnett, filed an application for adjustment of claim seeking benefits under the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2010)) for injuries he allegedly sustained to his back and neck on November 17, 2010, while working for respondent, Diversatech Metal Fab, Inc.  Following a hearing, the arbitrator determined that claimant's condition of ill-being was causally related to his work injury.  The arbitrator found that the medical and vocational evidence presented by claimant established that he was permanently and totally disabled as a result of his work-related injuries.  As such, the arbitrator awarded lifetime permanent total disability (PTD) benefits of $431.91 per week commencing on February 24, 2016, pursuant to section 8(f) of the Act (820 ILCS 305/8(f) (West 2010)).  The arbitrator also awarded claimant temporary total disability (TTD) benefits for 274-6/7 weeks from November 18, 2010, through February 23, 2016, and reasonable and necessary medical expenses of $290,437.56.

¶ 4     Respondent appealed to the Illinois Workers' Compensation Commission (Commission), which affirmed and adopted the arbitrator's findings with respect to causal connection, TTD benefits, and medical expenses.  However, the Commission vacated the arbitrator's award of PTD benefits, substituting in its stead a permanent partial disability (PPD) award of $259.15 per week for a period of 250 weeks, representing the loss of use of 50% of the person as a whole pursuant to section 8(d)(2) of the Act (820 ILCS 305/8(d)(2) (West 2010)).  In reaching this conclusion, the Commission found that there was insufficient medical evidence to establish that claimant was permanently and totally disabled.  The Commission further found that claimant did not qualify for PTD benefits under the odd-lot category because he failed to show a diligent but unsuccessful job

search. Claimant thereafter sought judicial review of the Commission's decision. The circuit court of McLean County confirmed the decision of the Commission.[1] On appeal, claimant argues that the Commission's decision to vacate the arbitrator's award of PTD benefits and substitute in its stead a percentage-of-the-person-as-a-whole award was against the manifest weight of the evidence. For the reasons set forth below, we reverse that portion of the judgment of the circuit court which confirmed the Commission's PPD award, but affirm the judgment of the circuit court in all other respects. In addition, we vacate the Commission's PPD award and remand the matter to the Commission with directions to consider whether claimant demonstrated eligibility for PTD benefits under the odd-lot category on the basis that there are no available jobs for a person in his circumstance in light of his age, training, education, experience, and condition.

¶ 5                                  II. BACKGROUND

¶ 6     On November 30, 2010, claimant filed an application for adjustment of claim alleging that he sustained injuries to his back and neck on November 17, 2010, while working for respondent. The matter proceeded to an arbitration hearing before arbitrator Michael Nowak. The following evidence is taken from the evidence presented at that hearing, which was held on April 5, 2016.

¶ 7     In November 2010, claimant was working for respondent as a sandblaster. In this position, claimant's duties consisted of transporting materials by hand or fork truck to and from workstations to his sandblasting booth. Claimant would then sandblast the material and move it to its next station. The parties stipulated that claimant sustained a work-related accident on

---

[1] Claimant originally sought review in the circuit court of Rock Island County, but venue was later transferred to McLean County.

November 17, 2010, while lifting items at work. Claimant was 21 years of age at the time of the injury.

¶ 8 Following the accident, claimant sought treatment at an urgent-care facility. Claimant was taken off work and referred for chiropractic treatment and physical therapy. In January 2011, claimant was evaluated by Dr. George DePhillips, a neurosurgeon. At that time, claimant was experiencing neck pain and lower back pain that radiated into the buttocks and posterolateral thighs to the knees. Dr. DePhillips kept claimant off work, prescribed Flexeril and Norco, and ordered a lumbar MRI. The lumbar MRI revealed (1) degenerative disc disease at the L4-L5 level, moderate in severity, with disc space narrowing and collapse and (2) a right posterolateral annular tear. Dr. DePhillips prescribed injections and continued physical therapy. Claimant reported that a series of two lumbar epidural steroid injections and trigger point injections did not provide relief. Dr. DePhillips ordered work conditioning, but claimant reported that it aggravated his back. A lumbar discogram prescribed by Dr. DePhillips indicated concordant pain at L4-L5. A post discogram CT scan revealed a grade 5 annular tear. Ultimately, Dr. DePhillips recommended a minimally invasive transforaminal lumbar interbody fusion at the L4-L5 level.

¶ 9 Claimant was seen by Dr. Anthony Rinella, a board-certified orthopaedic spine surgeon and respondent's section 12 examiner (see 820 ILCS 305/12 (West 2010)), on January 28, 2011, and June 3, 2011. Dr. Rinella diagnosed a lumbar strain and discogenic pain at L4-L5. Dr. Rinella expressed concern that on physical examination, claimant's pain is at the L5-S1 level, while the discogram demonstrated concordant pain at only the L4-L5 level. Dr. Rinella also expressed concern that at claimant's young age an L4-L5 or L4-S1 transforaminal lumber interbody fusion would predispose him to severe arthritis in the future. Given the lack of consistency between the

physical examination and the discogram, Dr. Rinella recommended a functional capacity evaluation (FCE) with permanent restrictions based thereon.

¶ 10    On July 5, 2011, claimant saw Dr. Michael Malek for a second opinion regarding surgery. Dr. Malek agreed with the recommendation for the L4-L5 lumbar fusion and indicated that claimant's condition of ill-being is related to the November 17, 2010, work injury.

¶ 11    Based upon the pretrial recommendation of the sitting arbitrator in 2012, claimant was evaluated by Dr. Fred Geisler. Claimant first saw Dr. Geisler on March 19, 2012. At that time, claimant reported extreme discomfort and tension in his lower back with pain radiating to his legs, mainly to the right. The pain was described as severe and was aggravated by standing, walking, sitting, sneezing, climbing stairs, riding in a car, straining at bowels, and general activity. Symptoms were improved by lying down and medication. Claimant's lumbar range of motion was moderately decreased with extension and bilateral lateral bending. Dr. Geisler diagnosed an "L4-5 disc dessication [*sic*] and discogram position at L4-L5." He attributed the condition to claimant's work injury. On February 11, 2013, Dr. Geisler performed an L4-L5 and L5-S1 anterior discectomy and fusion.

¶ 12    Following surgery, claimant continued to complain of low back pain with bilateral lower extremity pain. Physical therapy, aquatic therapy, and pain medication were prescribed. Claimant also participated in work conditioning from June 26, 2013, to August 2, 2013. During this time, the therapist noted that claimant had multiple shortened sessions due to his reported inability to continue because of intense pain. As of August 2, 2013, claimant's documented capabilities were: frequent repetitive kneeling, frequent sustained kneeling, 40 lb. squat lift, 40 lb. power lift, 40 lb. bilateral carry, 80 lb. pushing, 80 lb. pulling, and frequent walking. On August 6, 2013, claimant

refused to continue or complete the assigned activities due to intense pain. As a result, he was discharged from the work-conditioning program due to limited progress.

¶ 13    On August 14, 2013, claimant followed up with Dr. Geisler. His chief complaint was lower back pain that was the same or worse compared to before surgery. Claimant indicated that the pain was aggravated in physical therapy. Claimant also indicated that he can get an erection and climax, but nothing comes out. Dr. Geisler found these symptoms compatible with retrograde ejaculation. Upon examination, claimant had decreased lumbar range of motion with flexion, extension, and bilateral lateral bending. Dr. Geisler diagnosed status post L4-L5 total disc replacement and L5-S1 anterior lumbar interbody fusion, residual lower back pain aggravated in physical therapy/work hardening, and residual/unresolved retrograde ejaculation. A repeat lumbar MRI was ordered. It was also recommended that claimant restart physical therapy gently and work up.

¶ 14    On September 5, 2013, Dr. Rinella again evaluated claimant. At that time, claimant reported lumbosacral pain that he rated at a level 7 on a 10-point scale despite taking Norco regularly. He reported that his leg symptoms improved to some extent after the surgery but that his lumbar back pain was worse than before the surgery. Dr. Rinella recommended a CT scan of the lumbar spine to confirm fusion at L5-S1.

¶ 15    Claimant again attended physical therapy from September 23, 2013, through October 10, 2013, at which point therapy was discontinued due to lack of progress. On October 11, 2013, claimant followed up with Dr. Daniel Laich, who took over for Dr. Geisler upon his retirement. Claimant reported that he was experiencing more pain with "new" exercises in physical therapy. Dr. Laich noted that the lumbar MRI ordered by Dr. Geisler in August revealed a large amount of

artifact at L4-L5 and otherwise indicated mild multi-level degenerative disc disease and degenerative arthropathy of the lumbar spine without evidence for acquired canal stenosis or nerve impingement. Dr. Laich administered a disability index, asking claimant to rate his ability to perform certain tasks. In response, claimant indicated that he is able to care for himself (wash, dress, etc.), but it is very painful; he can lift only very light weight items; pain prevents him from walking more than four blocks, sitting more than one hour, and standing more than thirty minutes; and pain also limits him to less than six hours of sleep, severely interferes with sexual activity, and interferes with his social life. Claimant also indicated that while he can tolerate travel for more than two hours, the pain is bad. Dr. Laich's assessments were lumbar degenerative disc disease and lumbar stenosis without neurogenic claudication. He recommended a CT scan of the lumbar spine and referred claimant to pain management for lumbar facet injections.

¶ 16    Claimant underwent the CT scan of the lumbar spine on February 4, 2014. The radiologist indicated an apparent left paracentral and lateral protrusion versus soft tissue attenuation at L5-S1 without significant spinal canal stenosis or neuroforaminal narrowing. On February 19, 2014, Dr. Laich again referred claimant to pain management for lumbar facet injections. Claimant testified he was not able to undergo the injections because they were not authorized by respondent.

¶ 17    On July 24, 2014, Dr. Rinella reviewed the February 2014 CT scan of the lumbar spine. Dr. Rinella interpreted the study as showing "a lucency within the cage at L5-S1." Dr. Rinella concluded that claimant had a pseudoarthrosis (non-union) at L5-S1 and that it was "unclear the extent to which L4-5 is contributing to his pain." Given that claimant remained "significantly symptomatic" more than one year after his injury, Dr. Rinella recommended a posterior instrumented fusion at L5-S1 with consideration of extending the fusion to L4-L5. Dr. Rinella

stated that if claimant elects not to undergo surgery, then he has reached maximum medical improvement (MMI). In addition, Dr. Rinella continued to recommend an FCE to set long-term restrictions. Claimant did not undergo the procedure recommended by Dr. Rinella.

¶ 18    On November 20, 2014, at the request of his attorney, claimant attended an evaluation with Dr. Robert Eilers. At that time, claimant indicated difficulty with activities of daily living. For instance, claimant reported that he had problems bending over to bathe and put on socks and shoes. He needed to sit down to put on his pants. He had problems getting in and out of bed. He had difficulty shopping, carrying, standing, cooking, lifting overhead, cleaning, doing laundry, and doing yard work. Claimant stated that he can sit for about an hour, stand for 20 minutes, walk for 20 minutes, and drive for an hour. Claimant also reported a great deal of sleep disruption as his pain awakens him at night. Dr. Eilers agreed that the February 4, 2014, CT scan demonstrated pseudoarthrosis at L5-S1. Dr. Eiler's diagnostic impressions were L4-L5 disc herniation, L5-S1 disc herniation, status post fusion at L5-S1 and prodisc dynamic stabilizer placement at L4-L5, L5-S1 pseudoarthrosis accounting for his increased pain, impotence and retrograde ejaculation secondary to surgery, myofascial pain, and chronic low back pain secondary to multi-level fusion and pseudoarthrosis. Dr. Eilers opined that claimant's care has been reasonable and appropriate. He opined that claimant is permanently and totally disabled from employment with or without further surgery. Moreover, Dr. Eilers did not believe that claimant was even capable of sedentary work since he cannot sit or stand for prolonged periods of time and has few, if any, transferable skills.

¶ 19    In a report dated August 13, 2015, Dr. Rinella recommended permanent restrictions due to claimant declining to undergo an FCE. Dr. Rinella opined that claimant "is clearly not disabled."

Dr. Rinella noted that claimant's daily work-conditioning reports from July and August 2013 indicated that claimant was able to consistently squat lift 40 pounds, power lift 40 pounds, two-hand carry 40 pounds, push 80 pounds, and pull 80 pounds. Based upon these work-conditioning reports, Dr. Rinella recommended permanent restrictions of lifting no more than 40 pounds on an occasional basis (less than 33% of his workday) and pushing and pulling 80 pounds. Dr. Rinella would impose no restrictions with regard to standing and sitting.

¶ 20   Based upon the permanent restrictions recommended by Dr. Rinella, respondent retained vocational consultant Bob Hammond. On September 22, 2015, Hammond prepared a labor market review for medically appropriate positions. Although Hammond did not meet with claimant, he reviewed Dr. Eilers's November 2014 notes, Dr. Rinella's August 2015 report, claimant's August 2013 work-discharge summary, some of claimant's physical-therapy records, claimant's educational history, and claimant's work history. Based upon Dr. Rinella's restrictions, Hammond opined that claimant had limitations at the medium level and identified 20 "open and available" positions within claimant's residual functional capacity. As such, Hammond opined that there is a reasonable stable labor market in which claimant could find work.

¶ 21   On September 28, 2015, claimant saw Dr. Gawtham Gutta for pain management. Dr. Gutta assessed claimant with lumbago, lumbar radiculopathy, and neuropathy. He prescribed Hysingla ER. Claimant followed up with Dr. Gutta on December 3, 2015, at which time he prescribed morphine sulfate. Claimant saw Dr. Udit Patel for pain management on January 11, 2016. Dr. Patel indicated claimant is stable on the medications prescribed by Dr. Gutta. He ordered an FCE.

¶ 22   On January 21, 2016, claimant underwent the FCE. The FCE report states that claimant was onsite for four hours on one day. Although claimant failed 6 of 14 performance criteria, the

evaluator concluded that the "preponderance of the evidence indicate[d] [claimant] participated fully in testing" and exhibited "an acceptable effort *** likely represent[ing] his true status." Claimant demonstrated abilities in the sedentary, light, medium, and heavy levels, depending on the activity and was classified in the medium work-demand level for activity and at the sedentary work-demand level for endurance. The main limiting factors for return-to-work success were identified as: (1) subjective complaints of pain in the lower back; (2) symptoms in the lower extremities bilaterally; (3) decreased range of motion in the trunk and hips; (4) decreased isolation strength in the legs; (5) an inability to perform activity in ranges below the waist; (6) an inability to perform longer duration, higher frequency, and higher intensity activity without increasing the pain; and (7) a decreased ability to perform activity in the necessary time frame for a full-duty employee. The results of the FCE indicated claimant could function as follows:

"1. Material Handling: Occasional: floor to waist 43#, waist to shoulder 28#, overhead 18#, 2 hand carrying 28#, push force 88#, pull force 79#. Frequent: waist high 23#, shoulder high 23#, 2 hand carrying 14#.

2. Non-Material Handling: Occasional: sitting, standing, walking, and waist-high reaching. Frequent: grip and fine motor. Constant: nothing. Avoid: bending, squatting, climbing, kneeling, crawling, all constant activity performance, overhead, increased repetition, longer duration, and higher intensity activity."

It was further noted that claimant was only able to tolerate activity for four hours and that he needed to change positions and take frequent breaks. It was opined that he would not be able to return to work given his condition and his inability to tolerate longer bouts of activity without

breaks or changing positions. The evaluator spoke to claimant the following day and reported that he had increased pain in the low back and had been taking his medication and lying down.

¶ 23    Claimant followed up with Dr. Patel to review the FCE results. Dr. Patel indicated claimant was at MMI and put him on permanent restrictions per the FCE and limited to a four-hour workday.

¶ 24    At the request of his attorney, claimant met with vocational consultant Dennis Gustafson on February 17, 2016, for a vocational assessment. In conjunction with that meeting, Gustafson reviewed the FCE, Hammond's report, claimant's operative report, the report of Dr. Eilers, and some imaging reports. Gustafson testified by deposition regarding his findings. Claimant told Gustafson that a friend drove him to the appointment and the driver had to stop three times so claimant could get out of the car and walk around.

¶ 25    Gustafson noted that claimant attended high school in Arkansas for two years before dropping out. He completed a GED, but has no additional education or formal job training. After leaving high school, claimant had short-term jobs mowing grass, installing commercial flooring, and assisting a roofer. In March 2008, claimant moved from Arkansas to Streator, Illinois. He began working for respondent in January 2009 as a "paint helper" and a "sandblaster." Gustafson noted that sandblasting is considered an unskilled position with physical demand usually falling at the medium level. However, the specific job performed by claimant was heavy in terms of physical demand due to the material-handling requirements. Gustafson concluded that claimant had not gained any skills as a result of the jobs performed by him during his brief work history. As a result, claimant faces the job market as an entry-level worker subject to the physical limitations as set forth in the FCE.

¶ 26    Gustafson further noted that claimant underwent low-back surgery as a result of the injury he sustained at work in November 2010 and that claimant takes both morphine sulfate and a time release version of morphine on a daily basis.  Claimant reported that his girlfriend visits him on a daily basis and provides him assistance with cooking, laundry, and washing the dishes.  Claimant spends most of the day sitting or lying on his couch either watching TV or using a computer that is connected to the television.  Claimant sleeps on the couch at night since he is able to contort his body to a more comfortable position.  He reports getting approximately four hours of sleep per night.  For activity, claimant walks his dog about a half mile and engages in some upper extremity exercises.  Claimant normally restricts his driving to short distances around town, generally traveling further for medical appointments.  Gustafson remarked that claimant was "very talkative" and is the "type that just wants to dominate a conversation, perhaps wants to manipulate others in that regard, so forth.  He's not the kind that is likely to be able to communicate effectively with people because he's going to not have that intent probably to listen.  He's not a good listener."

¶ 27    Based upon his observed need to take frequent rest breaks as set forth in the FCE over a less than four-hour period, Gustafson opined that claimant would be unable to sustain work activity at an acceptable performance level to maintain employment.  Gustafson stated that the ability to regularly change body position without losing significant levels of productivity is normally found in jobs most often classified as sedentary and performed in an office-type environment.  Given claimant's lack of education or any experience suggesting competence in clerical-related tasks, it would be unlikely for him to be considered for entry-level employment of this kind.  Moreover, Gustafson felt that it would be unlikely that claimant would be able to physically tolerate regularly scheduled employment and meet the productivity requirements for such jobs on a sustained basis.

Additionally, Gustafson testified that employers would not hire an individual who they knew was taking narcotic medication, such as morphine. Therefore, based upon the totality of vocationally-relevant information, Gustafson opined that claimant is not capable of securing or sustaining competitive employment. Gustafson opined that if claimant is to realistically re-enter the job market, "it appears mandatory that he seek further education or training for skilled employment potentially consistent with physical limitations." As such, Gustafson advised claimant to seek assistance from the vocational guidance department at the local community college.

¶ 28    On cross-examination, Gustafson agreed that according to Dr. Rinella, claimant could work all jobs that would fall into the light physical-demand level and the majority of the jobs that would fall into the medium physical-demand level. However, Gustafson opined that the limitations recommended by Dr. Rinella were "not even close" to the restrictions set forth in the FCE. Gustafson noted that the FCE indicated that while claimant could function mostly in the medium physical-demand level for activity, he only had the endurance to work at a sedentary physical-demand level. Gustafson opined the FCE restrictions were more consistent with a light level of function whereas the restrictions imposed by Dr. Rinella were more consistent with a medium level of function.

¶ 29    Gustafson acknowledged that claimant uses a keyboard for his home computer. Gustafson stated that a data entry clerk would probably have to type 80 words per minute. Although Gustafson did not test claimant's typing skills, he did not believe that claimant would meet the requirements for a job such as data entry which requires a lot of keyboarding. Gustafson also testified that although claimant spends a lot of time on the couch, he reported doing so "lying or

in a contorted-type position," as opposed to a position like sitting in a chair, and he changes positions.

¶ 30    Gustafson testified that he normally recommends a part-time position for an individual who cannot work full time to build confidence. Gustafson opined, however, that claimant is "an individual that's not likely to ever be given a chance to do that because of his background and—and that he's not really a people person from what I could tell, he's not—he's an irritating guy, to be honest." Gustafson added that he "was getting some negative vibes" from claimant and that he "didn't see him as being personable in the sense you're going to put him into a people job or into an environment where he has to relate to people quite a bit in terms of communication." Gustafson acknowledged that while not all jobs require someone "to be a people person or to relate to people," an employee has to engage in communication with others in an office setting. Gustafson acknowledged that from the standpoint of physical capability to perform and endurance, claimant would be "much more apt" to be able to perform a part-time position than full time. However, Gustafson questioned claimant's "hireability," given his physical limitations in regard to sitting, standing, and moving around. Gustafson felt that claimant's employability was not realistic absent claimant obtaining some type of skill development for a job that meets his physical requirements.

¶ 31    Dr. Rinella testified by deposition twice, once on January 18, 2012, and once on February 17, 2016. Relevant here, Dr. Rinella noted that pursuant to his report of August 13, 2015, he established restrictions for claimant based on his daily work-conditioning reports from July and August 2013, because claimant had yet to undergo an FCE. Notably, claimant was able to lift from a squatted position 40 pounds and power lift 40 pounds. Further, claimant could two-hand carry 40 pounds and push and pull a slab weighing 80 pounds. Therefore, Dr. Rinella set

claimant's restrictions to lift no more than 40 pounds on an occasional basis, *i.e.*, 33 percent or less of his workday. Dr. Rinella also limited claimant to pushing and pulling 80 pounds maximum. Dr. Rinella imposed no limitations with respect to sitting and standing. Dr. Rinella did not believe that claimant was disabled and opined that many lines of employment fit within the restrictions he imposed.

¶ 32    Dr. Rinella noted that after he authored his final report on August 13, 2015, claimant underwent an FCE. Dr. Rinella reviewed the FCE. Dr. Rinella allowed that the restrictions set forth in the FCE were "more thorough" than those he imposed, but opined that his assessment was "probably within five pounds, if that" and the FCE results did not change his opinion. Dr. Rinella testified that he did not "go into overhead activities and things of that nature" because he did not have a basis to provide that, but opined that these numbers "would all fall within the same framework." With respect to the FCE's finding that claimant terminated the evaluation after four hours, Dr. Rinella noted that the half day of the FCE was longer than the 33% of the workday he specified in his restrictions. Dr. Rinella felt that claimant could work a full day within the restrictions identified in the FCE. While Dr. Rinella opined that while claimant is not permanently disabled as demonstrated on the FCE, he "would encourage [claimant] not to use his back for a living." Dr. Rinella testified that claimant should consider the surgery he recommended because if he has pseudoarthrosis, he has a treatable pain generator. Dr. Rinella explained that pseudoarthrosis means "false joint" and, in claimant's situation, signifies a lack of fusion across a joint or a failed fusion. Dr. Rinella testified that a pseudoarthrosis is "less stable in theory than a fused spine, but it's much more stable than a normal spine." He stated that claimant's spine was "extremely stable" despite the pseudoarthrosis and caused no instability in claimant's case. Dr.

Rinella testified that even in the absence of surgery, claimant would not be "disabled on any level as the functional capacity evaluation demonstrates."

¶ 33    On cross-examination, Dr. Rinella testified that the restrictions he recommended were based in part on his last examination of claimant in September 2013, but mostly on the daily work-conditioning reports in July and August 2013.  Dr. Rinella acknowledged that he did not see claimant or have any of his records beyond September 5, 2013.  He stated, however, that if claimant's symptoms remained unchanged, his recommendations would be accurate.  Even if claimant had increased leg symptoms after September 5, 2013, it would not change his opinion because having leg pain does not necessarily lower one's function or ability to lift.

¶ 34    Dr. Rinella described an FCE as "a one-day visit pushing the maximum limits."  He testified that the FCE did not have any basis for justifying claimant's ability to sit, stand, or stoop because those functions were not measured.  Dr. Rinella further acknowledged that on July 19, 2012, he encouraged claimant to avoid manual labor in the future and reiterated that he continues to recommend that he avoid manual labor.  He testified that he considers working on an assembly line, working as a picker/packer, and working as a janitor to be manual labor.  He admitted that he never documented any symptom magnification and that he believed claimant's pain complaints were legitimate and genuine.  He also agreed that pseudoarthrosis can cause increased levels of pain. Dr. Rinella indicated that it was not unusual for a patient to indicate he was "laid up" after an FCE because the purpose of such an evaluation is to push the patient "beyond the final restrictions."

¶ 35    Hammond also testified by deposition.  Hammond evaluated the vocational abilities of claimant by conducting a file review because his request to conduct an in-person interview of

claimant was refused. Hammond prepared two reports relative to his evaluation. The first report, dated September 22, 2015, consisted of a file review and a labor market survey. In relation to the first report, Hammond utilized standardized vocational research materials and reviewed physical therapy records and records from Dr. Eilers and Dr. Rinella. Hammond also prepared an addendum dated March 12, 2016, in response to some new medical information, including the FCE, a physician's update from Dr. Rinella, and Gustafson's vocational report.

¶ 36 Hammond testified that he evaluated the labor market based on claimant's medical restrictions and abilities. Hammond examined mostly lower medium level categories, light categories, and sedentary categories. Hammond attempted to identify positions that fit within Dr. Rinella's restrictions, which were based on the restrictions and limitations in the work-conditioning report. Hammond testified that he used the limitations identified by Dr. Rinella because Dr. Rinella was the only one who identified specific limitations.

¶ 37 Hammond identified several positions falling within claimant's restrictions, including switchboard jobs, assembly-line positions, telephone jobs, janitorial jobs, manual forklift positions, sterile processor, and spray painting. Hammond testified that the physical-demand capacity of these positions ranged from sedentary to the low-medium level. Hammond testified that the wages for the positions ranged between $8 and $13 an hour, with an average hourly wage of $11. Hammond testified that although his labor market survey involved only full-time positions, there are usually part-time positions available through temporary employment agencies. Hammond concluded that there are positions "readily available" that fit within claimant's profile of which claimant can avail himself. Hammond testified that there is a reasonably stable labor market for somebody with claimant's "profile."

¶ 38    Hammond noted that claimant presented for an FCE on January 21, 2016.  Hammond testified that the most significant finding from the FCE is that claimant was classified at the medium work-demand level, although he also demonstrated abilities at the sedentary, light, and heavy levels depending on the activity.  Hammond noted that claimant stopped the evaluation after four hours.  Hammond classified the stop as a "subjective stop," meaning that he did not see anything in the evaluation indicating that the evaluator wanted him to stop because of physiological responses on the evaluation.

¶ 39    Hammond disagreed with Gustafson's opinion that claimant cannot work.  He explained that the FCE indicates that claimant could work minimally at the light level and at a sedentary level with no problems.  Hammond also questioned Gustafson's recommendation that claimant go back to school if, as Gustafson found, claimant cannot work.  Hammond felt that if claimant can attend school full time, he can work full time.  Hammond testified that claimant's background in manual labor does not preclude him from obtaining a clerical position, noting that there are entry-level clerical jobs.

¶ 40    On cross-examination, Hammond testified that he was not aware of Dr. Rinella's opinion that claimant should avoid manual labor.  Hammond testified that this opinion was not relevant to his opinion. He added, however, that he would have to ascertain Dr. Rinella's definition of manual labor.  He further noted that claimant's FCE indicated that claimant could work at the medium level which would include some manual labor.  He conceded that his opinions were based upon claimant being capable of working a 40-hour work week.  He admitted that he never met claimant and does not have a feel for his communication skills or personality.  He testified that he agreed with Gustafson that claimant did not have transferrable skills.  Hammond conceded that he did not

have the record from Dr. Patel dated February 24, 2016, within which Dr. Patel set forth restrictions based upon the FCE of January 21, 2016.

¶ 41    Dr. Robert Eilers also testified by evidence deposition. Dr. Eilers is board certified in physical medicine and rehabilitation. On November 20, 2014, Dr. Eilers examined claimant at the request of claimant's law firm and generated a report of his findings. Claimant told Dr. Eilers that on November 17, 2010, he was working as a laborer for respondent, when he injured his back and neck. Eventually, claimant underwent an L4-L5 transforaminal fusion by Dr. Geisler on February 11, 2013. Claimant continued to complain of pain and numbness following surgery.

¶ 42    Claimant reported that he can walk only short distances without discomfort. Claimant also reported problems with coordination, balance, sleeping, bathing, getting dressed, shopping, standing, carrying, lifting overhead, cleaning, doing laundry, and doing yard work. Claimant can do these things, but he cannot do them continuously. Claimant's biggest problem is bending over. Following a physical examination, Dr. Eilers diagnosed an L4-L5 disc herniation. Dr. Eilers noted that claimant had a fusion done at L5-S1 and also a newly diagnosed L5-S1 pseudoarthrosis (nonunion). Dr. Eilers opined that the diagnostic impressions were causally related to the work accident of November 17, 2010. Dr. Eilers did not envision claimant being "competitively employed" and noted that he certainly cannot return to heavy work. At the very best, claimant may be able to "intermittently do sedentary type tasks" on a part-time basis. Dr. Eilers did not believe that claimant could work eight hours a day because he always has to change positions. Dr. Eilers opined that if claimant were to work, he would need to be on narcotic analgesics. Dr. Eilers opined that claimant's deficits are permanent.

¶ 43    On cross-examination, Dr. Eilers acknowledged that claimant's work-conditioning records indicated that claimant was able to perform "a number of activities." Dr. Eilers explained that while claimant can "do things," his spine is "unstable" and he is profoundly limited in what he can do competitively eight hours a day, forty hours a week. Moreover, even if claimant were able to perform desk work standing or sitting, he is without experience in that type of field.

¶ 44    Claimant testified that following the FCE, he was laid up for two or three days because of the pain. He testified that at the time of the hearing he was experiencing pain at a level seven or eight. He has constant low back pain that radiates to the legs. The constant back and leg pain that he feels is increased with physical activity, movement, and sitting in the same position for a period of time. He can generally sit for 5 to 20 minutes, but can sit longer "if [the] situation calls for it." He can be on his feet 10-20 minutes and then will experience increased pain. He testified that he weighed 180 pounds at the time of the November 2010 work accident and now weighs approximately 220 pounds. He takes a hot bath with Epsom salt every day for up to an hour, which seems to reduce some of the pain. He sleeps three to five hours in a typical night. He testified that he is always exhausted. He is able to dress himself. He performs household chores like the laundry and doing dishes by taking breaks about every five minutes. He walks his dog twice a day for anywhere from 5 to 15 minutes. He is able to exercise and hike. He sometimes sits on the couch, watching television or using a computer. Claimant knows how to type and uses the computer to play games, check his email, or look at Facebook. He stated that he has to take breaks while using the computer or doing chores. Claimant continues to experience retrograde ejaculation. This has made his sex drive almost non-existent and made him depressed. He has not attempted to find work within the restrictions placed upon him by Dr. Patel because he has such a hard time just

doing normal activity around the house and it is a struggle even driving in a car as he needs to take a break every 20 minutes. He has not sought further education for the same reasons. Claimant acknowledged that since his accident in November 2010, he has not attempted to look for a job, done a job search, or completed a job application. Claimant testified that he never considered going into service type work because he lacks people skills, has no patience, and gets aggravated easily.

¶ 45    Claimant acknowledged that he stopped the FCE in January 2016 after four hours based on his complaints of pain. Claimant testified that he wanted to stop earlier, but the evaluator encouraged him to "get a full four hours in." Claimant testified that he has considered undergoing additional surgery, but does not wish to do it because of the problems he had after the first surgery. He believes that the surgery made everything worse and that he does not trust another surgery.

¶ 46    Based on the foregoing evidence, the arbitrator determined that claimant's condition of ill-being was causally related to his work injury. The arbitrator found that the medical and vocational evidence presented by claimant established that he was permanently and totally disabled as a result of his work-related injuries. As such, the arbitrator awarded lifetime PTD benefits of $431.91 per week commencing on February 24, 2016 (the date that Dr. Patel found claimant to be at MMI), pursuant to section 8(f) of the Act (820 ILCS 305/8(f) (West 2010)). The arbitrator also awarded claimant TTD benefits from November 18, 2010, through February 23, 2016, a period of 274-6/7 weeks pursuant to section 8(b) of the Act (820 ILCS 305/8(a) (West 2010)) and reasonable and necessary medical expenses of $290,437.56 pursuant to section 8(a) and 8.2 of the Act (820 ILCS 305/8(a), 8.2 (West 2010)).

¶ 47    Respondent appealed to the Commission, which affirmed and adopted the arbitrator's findings with respect to causal connection, TTD benefits, and medical expenses. However, the Commission vacated the arbitrator's award of PTD benefits for life pursuant to section 8(f) of the Act (820 ILCS 305/8(f) (West 2010)), substituting in its stead a PPD award of $259.15 per week for a period of 250 weeks, representing the loss of use of 50% of the person as a whole pursuant to section 8(d)(2) of the Act (820 ILCS 305/8(d)(2) (West 2010)). In reaching this conclusion, the Commission found that there was insufficient medical evidence to establish that claimant was permanently and totally disabled. The Commission further found that claimant did not qualify for PTD benefits under the odd-lot category because he failed to show a diligent but unsuccessful job search. Claimant thereafter sought judicial review of the Commission's decision. The circuit court of McLean County confirmed the decision of the Commission. This appeal by claimant ensued.

¶ 48                                III.  ANALYSIS

¶ 49    On appeal, claimant argues that the Commission's decision to vacate the arbitrator's award of permanent and total disability benefits for life and substitute in its stead a percentage-of-the-person-as-a-whole award was against the manifest weight of the evidence.

¶ 50    An employee is permanently and totally disabled if he or she is obviously unemployable, *i.e.*, unable to make some contribution to industry sufficient to justify the payment of wages or there is medical evidence to establish a claim of PTD. *Sharwarko v. Illinois Workers' Compensation Comm'n*, 2015 IL App (1st) 131733WC, ¶ 53. However, an employee need not be reduced to complete physical incapacity to be entitled to PTD benefits. *Ceco Corp. v. Industrial Comm'n*, 95 Ill. 2d 278, 286-87 (1983). If an employee's disability is limited and it is not obvious that the employee is unemployable, the employee may nevertheless demonstrate an entitlement to

PTD by proving he or she fits within the "odd lot" category. *Westin Hotel v. Industrial Comm'n*, 372 Ill. App. 3d 527, 544 (2007). The odd-lot category consists of employees who, "though not altogether incapacitated for work, [are] so handicapped that [they] will not be employed regularly in any well-known branch of the labor market." *Valley Mould & Iron Co. v. Industrial Comm'n*, 84 Ill. 2d 538, 547 (1981) (citing 2 Arthur Larson *et al.*, Workmen's Compensation § 57.51, at 10-164.24 (1980)). An employee generally fulfills the burden of establishing that he or she falls into the odd-lot category in one of two ways: (1) by showing a diligent but unsuccessful search for employment or (2) by demonstrating that because of age, training, education, experience, and condition, there are no available jobs for a person in his or her circumstance. *Professional Transportation, Inc. v. Illinois Workers' Compensation Comm'n*, 2012 IL App (3d) 100783WC, ¶ 34; *Alano v. Industrial Comm'n*, 282 Ill. App. 3d 531, 534-35 (1996). If an employee makes this showing, the burden shifts to the employer to show that some kind of suitable work is available to the employee. *Westin Hotel*, 372 Ill. App. 3d at 544. This issue presents a question of fact. *Professional Transportation, Inc.*, 2012 IL App (3d) 100783WC, ¶ 33. In resolving questions of fact, it is within the province of the Commission to assess the credibility of witnesses, resolve conflicts in the evidence, assign weight to be accorded the evidence, and draw reasonable inferences from the evidence. *Hosteny v. Illinois Workers' Compensation Comm'n*, 397 Ill. App. 3d 665, 674 (2009). We will not overturn the decision of the Commission regarding the nature and extent of an injury unless it is against the manifest weight of the evidence. *Professional Transportation, Inc.*, 2012 IL App (3d) 100783WC, ¶ 33. A decision is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *Professional Transportation, Inc.*, 2012 IL App (3d) 100783WC, ¶ 33. Thus, where the Commission's inferences are

reasonable, such inferences cannot be disregarded because other inferences might have been drawn from the same facts. *Berry v. Industrial Comm'n*, 99 Ill. 2d 401, 406-07 (1984).

¶ 51    In this case, claimant argues that he established permanent and total disability by a preponderance of the medical evidence. However, the Commission found that there was no definitive medical opinion that claimant was permanently and totally disabled from working. The evidence of record supports this finding. While the notes from Dr. Eilers's November 2014 evaluation indicate that claimant was permanently and totally disabled from competitive employment, Dr. Eilers admitted in his deposition testimony that claimant may be able to "intermittently do sedentary type tasks" on a part-time basis. See *Hallenbeck v. Industrial Comm'n*, 232 Ill. App. 3d 562, 569 (1992) (noting that the ability to perform sedentary work militates against a finding of permanent and total disability). Dr. Rinella was more definitive, opining in his report of August 13, 2015 (before claimant underwent an FCE), that claimant "is clearly not disabled" and that he could return to work in accordance with the permanent restrictions set forth in the daily work-conditioning reports of July and August 2013. Dr. Rinella further testified at his second deposition (after claimant underwent the FCE) that claimant could work a full day within the restrictions set forth in the FCE. The FCE classified claimant at the medium work-demand level for activity and at the sedentary work-demand level for endurance. Dr. Patel also determined that claimant was capable of returning to work within the permanent restrictions set forth in the February 2016 FCE, albeit limited to a four-hour workday. And while claimant asserts that "a 4-hour workday in and of itself restricts [him] to work that is not full-time, regular and continuous," he cites no authority that the availability of only part-time work entitles him to PTD benefits. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (requiring the appellant's brief to

include "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities.") More importantly, however, Dr. Rinella imposed no such restriction and, as noted above, expressly testified at his deposition that claimant could work a full day within the restrictions identified in the FCE. At best, then, the medical evidence is conflicting with respect to whether claimant established a claim of permanent and total disability by way of the medical evidence. As noted above, it is within the province of the Commission to resolve conflicts in the evidence. *Hosteny*, 397 Ill. App. 3d at 674. Here, the Commission resolved this conflict against claimant, finding that the testimony of respondent's medical witnesses was more persuasive than the testimony of claimant's medical witnesses. Given the evidence of record, we cannot say that a finding opposite that of the Commission is clearly apparent. As such, we cannot conclude that the Commission's finding that the medical evidence did not establish that claimant is permanently and totally disabled is against the manifest weight of the evidence.

¶ 52    Since claimant did not establish that he is permanently and totally disabled by a preponderance of the medical evidence and because claimant does not otherwise assert that he is obviously unemployable, claimant was required to demonstrate entitlement to permanent and total disability benefits by proving he fits within the odd-lot category. *Westin Hotel*, 372 Ill. App. 3d at 544. As noted above, an employee generally fulfills the burden of establishing that he or she falls into the odd-lot category by showing a diligent but unsuccessful search for employment or by demonstrating that because of age, training, education, experience, and condition, there are no available jobs for a person in his or her circumstance. *Professional Transportation, Inc.*, 2012 IL App (3d) 100783WC, ¶ 34; *Alano*, 282 Ill. App. 3d at 534-35. Here, the Commission concluded that claimant failed to establish that he conducted a diligent but unsuccessful job search. Claimant

does not dispute the Commission's finding on this point. Indeed, the record undeniably supports the Commission's finding. In this regard, claimant admitted at the arbitration hearing that he never attempted to find work within the restrictions imposed by Dr. Patel, he has not enrolled in school, and he has not participated in any vocational training. Hence, claimant had to demonstrate that because of his age, training, education, experience, and condition, there are no available jobs for a person in his circumstance.

¶ 53    Claimant argues that he met this burden through Gustafson, his vocational expert, and his own testimony. However, the Commission never addressed whether claimant established that he fell into the odd-lot category by demonstrating that because of his age, training, education, experience, and condition, there are no available jobs for a person in his circumstance. This is so despite the fact that respondent sought reversal of the arbitrator's decision before the Commission on the basis that claimant failed to satisfy his burden under either prong of the odd-lot analysis. Instead, after finding that claimant failed to show a diligent, but unsuccessful job search, the Commission terminated its analysis and concluded that claimant "does not qualify to be declared permanently and totally disabled from gainful employment under an odd-lot theory." This was error as the Commission failed to consider the second method of establishing odd lot. Accordingly, we reverse that portion of the circuit court order which confirmed the Commission's award of PPD benefits to claimant under section 8(d)(2) of the Act, but affirm the circuit court in all other respects. Furthermore, we vacate that portion of the Commission's award of PPD benefits to claimant under section 8(d)(2) of the Act and we remand the matter to the Commission for further proceedings consistent with this order. Upon remand, the Commission shall make appropriate findings of fact and conclusions of law necessary to determine whether the claimant proved he was

permanently and totally disabled under an odd-lot theory by demonstrating that because of his age, training, education, experience, and condition, there are no available jobs for a person in his circumstance. If the Commission concludes that claimant did sustain his burden in this regard, the burden shifted to respondent and the Commission shall consider whether respondent showed that some kind of suitable work is available to claimant. We voice no opinion on the ultimate outcome of these issues.

¶ 54                              IV. CONCLUSION

¶ 55    For the reasons set forth above, the judgment of the circuit court of McLean County is affirmed in part and reversed in part, the decision of the Commission is vacated in part, and the matter is remanded to the Commission for further action consistent with this order.

¶ 56    Circuit court affirmed in part and reversed in part; Commission decision vacated in part and remanded with directions.