NASCOTE INDUSTRIES, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Laurie K. Berry, Appellee).

Fifth District (Industrial Commission Division)   No. 5—04—0121WC

Opinion filed December 1, 2004.

Andrew S. de Blank, of Knell & Kelly, L.L.C., of Peoria, for appellant.

T. Fritz Levenhangen, of T. Fritz Levenhangen, P.C., of Belleville, for appellee.

JUSTICE HOFFMAN delivered the opinion of the court:

Nascote Industries (Nascote) appeals from a circuit court order confirming a decision of the Industrial Commission (Commission) awarding temporary total disability (TTD) benefits, permanent partial disability (PPD) benefits, maintenance benefits, medical expenses, penalties, and attorney fees to the claimant, Laurie K. Berry, in connection with her application for adjustment of claim under the Workers' Compensation Act (Act) (820 ILCS 305/1 et seq. (West 2002)). For the reasons that follow, we affirm in part and reverse in part.

On June 9, 1999, the claimant filed an application for adjustment of claim alleging that she had suffered an accidental injury on January 5, 1999, while working for Nascote. At the beginning of the arbitration hearing, the parties submitted a request for hearing form wherein they stipulated, inter alia, that the claimant was paid all TTD benefits owed up until January 8, 2001, and that the claimant was paid $3,106.95 in "TPD [temporary partial disability]/maintenance" benefits for the period between March 15, 2000, and July 6, 2000. The

following facts were established by the testimony and exhibits presented at the hearing.

The claimant testified that she began her employment with Nascote in 1995, and that at the time of her injury on January 5, 1999, she was employed as a paint technician. On the day she was injured, however, the claimant stated that she was "filling in" as a washer technician, which was a job she performed "on occasion." As a washer technician, the claimant testified that her job entailed the collection of information from certain machines utilizing a 28-pound data recorder. During the data collection process, the claimant stated, she was required to repeatedly lift and carry the data recorder while walking up and down a staircase. According to the claimant, after performing these duties on January 5, 1999, she began to experience a sharp pain in her lower back which extended down her hip and through her left leg.

The claimant stated that she told her supervisor about her injury, and that she visited Dr. John Osborn, her family practitioner, on January 14, 1999. After undergoing a CT scan, an MRI, and visiting several doctors, the claimant was diagnosed with a herniated lumbar disc and was advised to have surgery. On April 12, 1999, the claimant underwent a microdiscectomy and foraminotomy. Following surgery, the claimant continued to experience pain in her lower back and was referred by her attorney to Dr. Joseph Hanaway.

On August 16, 1999, the claimant underwent a myelogram and post-myelogram CT scan. In a post-examination report dated September 14, 1999, Dr. Hanaway opined that the post-myelogram CT scan revealed a large mass and a protruding disc. The doctor ordered an MRI with contrast to determine whether the post-myelogram CT scan was showing scar tissue or a herniated disc, and stated that the claimant should "not be working." The resulting MRI revealed, in Dr. Hanaway's opinion, evidence of re-extruded disc material in the lower lumbar region with some scar enhancement. Due to the claimant's reluctance to revisit the surgeon who performed her microdiscectomy and foraminotomy, Dr. Hanaway referred her to Dr. George Schoedinger for a surgical consultation.

On November 1, 1999, Dr. Schoedinger performed his initial examination of the claimant. In a report of that examination, the doctor opined that the claimant's persistent lower back pain was caused by retained disc material with an associated disc rupture. A contemporaneous patient status report stated that the claimant was unable to return to work and placed her return to work date as indefinite. On January 3, 2000, Dr. Schoedinger performed an anterior lumbar discography and instrumented interbody infusion.

On January 31, 2000, the claimant was once again examined by Dr. Schoedinger, who stated in a patient status report that the claimant was unable to return to work. In that same report, he noted that the claimant was sent to physical therapy for a home exercise program that she was to pursue on a regular basis.

The claimant next saw Dr. Schoedinger on March 13, 2000. In a patient status report dated that same day, Dr. Schoedinger specified that the claimant could return to work as of March 15, 2000, with restrictions of a four-hour work day, doing sedentary work and no lifting of more than 10 pounds. Accordingly, on March 15, 2000, the claimant signed a return to work agreement wherein she accepted a position at Nascote working four-hour shifts doing sedentary work with no lifting over 10 pounds. That return to work agreement, which was also signed by the claimant's supervisor and Monica Zopp, the occupational health nurse at Nascote, states, in part, that: "It is agreed that through completion of these realistic rehabilitation activities the aim is to achieve the stated objective, of return to regular duty."

Dr. Schoedinger next saw the claimant on April 24, 2000. In a report of that visit, he noted that the claimant told him that she had been doing her exercises.

On July 6, 2000, Dr. Schoedinger prescribed a physical therapy program for the claimant that was to be conducted three days per week for eight weeks. In a post-examination report dated the same day, Dr. Schoedinger stated that the claimant could increase her sedentary four-hour work day to an eight-hour work day. Thereafter, the claimant returned to working eight-hour, light duty shifts.

Pursuant to Dr. Schoedinger's instructions, the claimant underwent physical therapy from July 17, 2000, through August 21, 2000. The therapy was provided by Nascote at Healthsouth. In Healthsouth's final report dated August 21, 2000, the physical therapist noted that the claimant continued to complain of lower back pain, radiating into both legs. He stated that the claimant exhibited a guarding posture while standing and continued to have palpable muscle spasms of the paraspinal and periformis muscles.

On August 22, 2000, Dr. Schoedinger concluded that the claimant had reached maximum medical improvement (MMI) and that she should undergo a functional capacity evaluation (FCE). The claimant completed an FCE on September 11, 2000, the results of which, as described by Dr. Schoedinger in a letter dated September 26, 2000, indicated that the claimant was capable of light duty work consistent with the tasks required of a paint technician. In a letter dated October 16, 2000, Dr. Schoedinger opined that, based on the results of the FCE, the claimant could be placed in a work situation that required no more than 15 pounds of lifting.

The claimant resumed her treatment with Dr. Hanaway on September 26, 2000. At that time, Dr. Hanaway was of the opinion that the claimant was "permanently and totally disabled."

The claimant testified that in October 2000 she returned to the paint department where she had worked prior to her injury. According to Zopp, as of October 2000, the claimant was performing the same paint technician duties that she had performed prior to January 5, 1999. Zopp further testified that the claimant could work as a paint technician within her 15-pound lifting restriction.

In a post-examination letter dated December 21, 2000, Dr. Hanaway indicated that the claimant "is simply going to have to live with a chronic pain problem as long as she continues to work at her present job" and that "considering her physical findings and her complaints she is not long for the job." On January 8, 2001, Dr. Hanaway issued the claimant an off-work slip due to her "failed surgical back syndrome."

At Nascote's request, the claimant was examined by Dr. David M. Peeples on February 6, 2001. In his March 19, 2001, report of that examination, Dr. Peeples stated that he had reviewed the claimant's medical records, FCE report, and radiology reports and had conducted his own independent medical examination. The doctor opined that the claimant could work in a light duty capacity with restrictions of no lifting greater than 15 pounds and no repetitive bending, twisting, or climbing.

The claimant signed a second return to work agreement with Nascote on May 1, 2001. Pursuant to the agreement, the claimant returned to work with the sole medical restriction of no lifting greater than 15 pounds.

Following the hearing, the arbitrator found, *inter alia*, that the claimant sustained an accidental injury on January 5, 1999, arising out of and in the course of her employment by Nascote and that a causal relationship existed between the claimant's condition of ill-being and her work-related accident. The arbitrator also found that the $3,106.95 Nascote had voluntarily paid the claimant between March 15, 2000, and July 6, 2000, while she was restricted to four-hour workdays, constituted maintenance benefits due under the Act and, accordingly, that Nascote was not entitled to credit those payments against the claimant's permanency award. The arbitrator awarded the claimant TTD benefits for a period of $10^1/_7$ weeks, representing the period from January 8, 2001, through March 19, 2001; PPD benefits for 35% loss of a person as a whole; and $5,689.24 for the claimant's necessary medical, surgical, and hospital expenses. The arbitrator also awarded the claimant $2,234.53 in penalties under

section 19(k) of the Act (820 ILCS 305/19(k) (West 2002)), $2,500 in penalties under section 19(*l*) of the Act (820 ILCS 305/19(*l*) (West 2002)), and $893.81 in attorney fees pursuant to section 16 of the Act (820 ILCS 305/16 (West 2002)).

Nascote sought review of the arbitrator's decision before the Commission. The Commission affirmed and adopted the arbitrator's decision. Thereafter, Nascote sought judicial review of the Commission's decision in the circuit court of Clinton County. The circuit court confirmed the Commission's decision, and Nascote initiated the instant appeal.

Nascote first contends that the Commission's finding that the claimant was entitled to TTD benefits for the period between January 8, 2001, and March 19, 2001, is against the manifest weight of the evidence. Nascote argues that TTD benefits are improper because the claimant reached MMI on August 22, 2000, and had resumed her regular work activities as of October 2000. The claimant responds that TTD benefits were proper because Dr. Hanaway had issued her an off-work slip.

■ A claimant is temporarily totally disabled from the time an injury incapacitates her from work until such time as she is as far recovered or restored as the permanent character of her injury will permit. *Archer Daniels Midland Co. v. Industrial Comm'n*, 138 Ill. 2d 107, 118, 561 N.E.2d 623 (1990). The dispositive test is whether the claimant's condition has stabilized, *i.e.*, whether she has reached MMI. *Mechanical Devices v. Industrial Comm'n*, 344 Ill. App. 3d 752, 759, 800 N.E.2d 819 (2003). In determining whether a claimant has reached MMI, a court may consider factors such as a release to return to work and medical testimony or evidence concerning the claimant's injury, the extent thereof, and, most importantly, whether the injury has stabilized. *Mechanical Devices*, 344 Ill. App. 3d at 760. Once an injured claimant has reached MMI, the disabling condition has become permanent and she is no longer eligible for TTD benefits. *Archer Daniels Midland Co.*, 138 Ill. 2d at 118. The time during which a claimant is temporarily totally disabled presents a question of fact to be determined by the Commission, and the Commission's decision will not be upset on review unless it is against the manifest weight of the evidence. *Archer Daniels Midland Co.*, 138 Ill. 2d at 118-19.

In this case, the Commission found that the claimant was entitled to TTD benefits from January 8, 2001, through March 19, 2001, because she had received an off-work slip from Dr. Hanaway indicating that she was unable to work. Implicit in this decision was a finding that the claimant did not reach MMI prior to January 8, 2001. In arguing for the propriety of this decision, the claimant merely claims

that TTD benefits are proper whenever an "injured worker is unable to perform any substantial gainful employment due to a condition which is the direct result of a work-related injury." While this argument may contain some truth, it ignores the fact that, once a claimant reaches MMI, he or she is no longer eligible for TTD benefits. The record in this case shows that the claimant reached MMI before January 8, 2001.

The medical testimony and evidence shows that by October 2000 the claimant had recovered as far as the permanent character of her injury would permit. On August 22, 2000, Dr. Schoedinger, who had been treating the claimant and performed her most recent surgery, concluded that she had reached MMI. Moreover, Dr. Schoedinger found that, based on the results of the claimant's FCE, she could resume her regular job as a paint technician. Accordingly, in October 2000, the claimant returned to her regular, pre-injury job as a paint technician. Therefore, although the claimant was still disabled, the evidence shows that her condition had stabilized as far as her injury would permit.

■ Furthermore, and contrary to the claimant's assertion, we believe that Dr. Hanaway's testimony and medical records support this conclusion. At his deposition, Dr. Hanaway consistently testified that the claimant was suffering from permanent lower back pain with symptoms "of which she's going to live with the rest of her life." Moreover, in a letter dated September 26, 2000, Dr. Hanaway stated that the claimant was "permanently and totally disabled." Thus, according to Dr. Hanaway, the claimant's condition had stabilized in that the pain she was experiencing was "never going to go away," and "she [was] simply going to have to live with chronic pain." For these reasons, we believe that by October 2000, when the claimant returned to her regular duty job, she was as far recovered or restored as the permanent character of her injury would permit. Therefore, because her disabling condition had become permanent, she was no longer eligible for TTD benefits, and the Commission's decision to award such benefits for the period between January 8, 2001, and March 19, 2001, is against the manifest weight of the evidence.

Nascote next contends that the Commission erred in awarding penalties under sections 19(k) and (l) of the Act, and attorney fees under section 16 of the Act.

■ Penalties under section 19(k), like awards of attorney fees and costs under section 16, are premised upon an adjudication in favor of the claimant. *Brinkmann v. Industrial Comm'n*, 82 Ill. 2d 462, 469, 413 N.E.2d 390 (1980). In this case, the claimant was awarded section 19(k) penalties, and section 16 attorney fees, due to Nascote's failure to pay her TTD benefits for the period between January 8, 2001, and

March 19, 2001. However, as discussed above, the claimant is not entitled to an award of TTD benefits for that period, and the Commission's contrary finding is against the manifest weight of the evidence. Thus, as the claimant is not entitled to a TTD award for the period in issue, she is not entitled to section 19(k) penalties and section 16 attorney fees or costs by reason of Nascote's failure to pay those benefits.

Similarly, while penalties under section 19(*l*) may properly be awarded following a claimed injury but prior to a judicial determination of liability, "the sanction of payments of additional compensation for failure to pay these benefits may not be imposed where there has been a good-faith challenge by the employer to the claim of liability." *Brinkmann*, 82 Ill. 2d at 469. Here, as discussed above, Dr. Schoedinger placed the claimant at MMI and she returned to her regular duty job prior to January 8, 2001. Based on this and other evidence, we find that Nascote's challenge to the claim for TTD benefits subsequent to October 2000 was made in good faith and, therefore, the claimant was not entitled to penalties under section 19(*l*).

■ Nascote next contends that the Commission erred in failing to allow it a credit against the claimant's permanency award for $3,106.95 in benefits it paid her during the period between March 15, 2000, and July 6, 2000, when she was working four-hour shifts. Nascote argues that the Act does not authorize the payment of "temporary partial disability" benefits and that the claimant was not entitled to maintenance benefits during the period in question.

We agree with Nascote's assertion that the Act does not contemplate an award of benefits for "temporary partial disability" and that any such award would be improper. See 820 ILCS 305/8 (West 2002); *Mechanical Devices*, 344 Ill. App. 3d at 762. The Commission, however, did not award the claimant "temporary partial disability" benefits. Rather, the arbitrator found that the claimant was entitled to receive maintenance benefits for the period between March 15, 2000, and July 6, 2000, when she was working four-hour shifts. He concluded, accordingly, that Nascote was not entitled to a credit against the claimant's permanency award for the sums it paid the claimant during that period. The Commission affirmed and adopted those findings. Consequently, the underlying issue before this court is whether an award of maintenance to the claimant for the period from March 15, 2000, through July 6, 2000, is against the manifest weight of the evidence.

Section 8(a) of the Act provides that an "employer shall also pay for treatment, instruction and training necessary for the physical, mental and vocational rehabilitation of the employee, including all maintenance costs and expenses incidental thereto." 820 ILCS 305/

8(a) (West 2002). By its terms, the statute provides for physical rehabilitation as well as vocational rehabilitation, and mandates that the employer pay all maintenance costs and expenses incidental thereto.

Rehabilitative efforts may be undertaken even though the extent of an employee's permanent disability cannot yet be determined. *Hartlein v. Illinois Power Co.*, 151 Ill. 2d 142, 165, 601 N.E.2d 720 (1992); *Freeman United Coal Mining Co. v. Industrial Comm'n*, 318 Ill. App. 3d 170, 179-80, 741 N.E.2d 1144 (2000). It follows then that a claimant might be entitled to maintenance benefits incidental to a rehabilitation program before he or she has reached maximum medical improvement.

In this case, Dr. Schoedinger ordered a physical therapy program for the claimant in the form of home exercises on January 31, 2000. On March 13, 2000, he determined that the claimant could return to work, but restricted her to four-hour shifts of sedentary activity, involving lifting of no more than 10 pounds. On March 15, 2000, the claimant and representatives of Nascote entered into a return to work agreement, providing that the claimant would begin working four-hour shifts performing tasks within the restrictions outlined by Dr. Schoedinger. The return to work agreement specifically states that it was a "Transitional Duty Plan," consisting of "rehabilitation activities," the object of which was to return the claimant to regular duty. From these facts, we believe that the Commission could reasonably infer that the claimant worked four-hour shifts from March 15, 2000, through July 6, 2000, in furtherance of a physician-approved rehabilitation plan, and that Nascote voluntarily and actively participated in that program.

Section 8(a) of the Act provides for an award of maintenance while an employee is engaged in a prescribed rehabilitation program. *Connell v. Industrial Comm'n*, 170 Ill. App. 3d 49, 55, 523 N.E.2d 1265 (1988). Having found that the Commission could reasonably infer that the claimant's part-time employment was part of a physician-approved rehabilitation plan, we find no error in its award of maintenance benefits for the period that the claimant worked four-hour shifts. We conclude, therefore, that the Commission properly denied Nascote a credit against the claimant's permanency award for the $3,106.95 in maintenance benefits it paid her during the period from March 15, 2000, through July 6, 2000.

For the foregoing reasons, we reverse that portion of the circuit court's order confirming the Commission's award of: TTD benefits for the period between January 8, 2001, and March 19, 2001; penalties

under sections 19(k) and 19(*l*) of the Act; and attorney fees under section 16 of the Act. We affirm the remainder of the order.

Affirmed in part, reversed in part.

McCULLOUGH, P.J., and CALLUM, HOLDRIDGE, and GOLD-ENHERSH, JJ., concur.