**NOTICE**: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (1st) 182556WC-U

FILED: February 14, 2020

NO. 1-18-2556WC

IN THE APPELLATE COURT

OF ILLINOIS

FIRST DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION

| | | |
|---|---|---|
| PATRICK A. WILKISON, | ) | Appeal from |
| Appellant, | ) | Circuit Court of |
| | ) | Cook County |
| v. | ) | No. 18L50071 |
| THE ILLINOIS WORKERS' COMPENSATION | ) | |
| COMMISSION *et al.* (City of Chicago, | ) | Honorable |
| Appellee). | ) | James Michael McGing, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Holdridge and Justices Hoffman, Hudson, and Barberis concurred in the judgment.

**ORDER**

¶ 1     *Held*: (1) By finding claimant was not entitled to temporary and total disability benefits after May 2013 because he had been offered a modified duty work assignment but declined it, the Illinois Workers' Compensation Commission (Commission) did not make a finding that was against the manifest weight of the evidence.

(2) The Commission's decision which found claimant had been offered a modified duty work assignment that did not contradict any valid medical or physical restriction was not against the manifest weight of the evidence.

(3) The Commission's decision to deny claimant additional benefits, vocational rehabilitation, or penalties was not against the manifest weight of the evidence.

¶ 2     In October 2003, claimant, Patrick Wilkison, filed an application for adjustment of

claim pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 to 30 (West 2002)), seeking benefits from appellee, his employer, City of Chicago. It is undisputed that claimant suffered a work-related accident on August 8, 2003, injuring his back.

¶ 3 Following a hearing, the arbitrator awarded claimant temporary total disability benefits (TTD) from April 5, 2013, through May 31, 2013, in the amount of $902.72 per week and the reasonable and necessary medical expenses in the amount of $28,468.75, less a credit of $6,259.55 for medical benefits already paid. No penalties were awarded. The arbitrator denied claimant's request for TTD after May 31, 2013, vocational rehabilitation, and penalties. On review, the Illinois Workers' Compensation Commission (Commission) adopted the arbitrator's decision in full. On judicial review, the circuit court of Cook County confirmed the Commission.

¶ 4 Claimant appeals, arguing (1) the Commission's decision that the City offered claimant a valid and medically compliant job offer was against the manifest weight of the evidence, (2) the Commission's decision, which encouraged claimant to violate his doctor's restriction was erroneous as a matter of law, and (3) the Commission's decision to deny maintenance benefits, vocational rehabilitation, and penalties under sections 8(a) and 19(1) of the Act was against the manifest weight of the evidence.

¶ 5 Like the circuit court, we are unable to say the Commission's decision is against the manifest weight of the evidence. Therefore, we affirm the judgment.

¶ 6                                 I. BACKGROUND

¶ 7 On November 20, 2014, the arbitrator heard evidence on claimant's petition. Claimant testified he began as an operating engineer for the City of Chicago (City) in 1990. In approximately 1994, he was transferred to the Water Department performing essentially the same duties as his previous operating-engineer position within the Streets and Sanitation Department.

For the Water Department, he laid water mains, which involved breaking up concrete streets with backhoes and other heavy machinery. His job description included lifting requirements of 35 pounds frequently and up to 100 pounds occasionally. On August 8, 2003, he was digging a trench for the installation of a water main using a backhoe when the street underneath him collapsed. The backhoe fell to the left and into the ditch. Claimant fell to the left as well, hitting the window and injuring his back.

¶ 8        Claimant was taken by ambulance to the emergency room of Little Company of Mary Hospital and was treated and released. The City referred claimant to Mercy Works clinic and there, in August 2003, he came under the care of Dr. Homer Diadula. Dr. Diadula performed a magnetic resonance imaging (MRI) of claimant's lumbar spine, diagnosed him with an L4-L5 annular tear, ordered claimant off work, referred him to physical therapy, and referred him to spine specialist Dr. Frank Phillips at Midwest Orthopaedics at Rush University Medical Center.

¶ 9        On October 9, 2003, claimant returned to work but he experienced an increase in low back pain. Dr. Phillips again ordered claimant off work on October 29, 2003, and referred claimant to Dr. Joseph Fillmore for injections. Treatment and physical therapy continued until March 2004 when claimant again attempted to return to work.

¶ 10        Claimant worked periods of light duty and full duty from March 2, 2004, through March 2, 2006. At that time, claimant returned to Mercy Works, advising he wished to undergo the surgery that had been previously recommended but he had declined.

¶ 11        On March 1, 2007, Dr. Srdjan Mirkovic of Northwestern Orthopaedic Institute, upon a referral from Mercy Works, performed claimant's fusion surgery. Claimant continued under Dr. Mirkovic's care until May 28, 2013. According to the results of a February 6, 2008, functional capacity evaluation (FCE), Dr. Mirkovic allowed claimant to return to work at light

duty with lifting restrictions and the ability to operate only certain types of trucks. The City invited claimant to participate in job search and vocational rehabilitation.

¶ 12        As of March 31, 2009, Dr. Diadula opined claimant had reached maximum medical improvement (MMI), ordered claimant restricted to limited duty, and discharged claimant from care.

¶ 13        In May 2010, the City informed claimant a light-duty job within his restrictions was available in the South District, where claimant had been employed. He would be operating a compressor truck. He performed that job for approximately seven weeks. However, in July 2010, foreman Marsha Simmons asked claimant to operate a backhoe or "go home." Claimant said he attempted the machine by driving around the block but, he advised Simmons he "could not do it." Claimant returned to Mercy Works and specifically, Dr. Mirkovic, who noted claimant had been tolerating the compressor truck but, he was experiencing "increased problems while sitting/sedentary too long." He ordered claimant off work. The City was unable to accommodate claimant's restrictions.

¶ 14        In December 2011, the City again invited claimant to work in the South District driving the same compressor truck he did in 2010 within his work restrictions. He was driving short distances and sitting for no more than 30 minutes at a time. Claimant said he sometimes felt uncomfortable with the "jostling" of the truck but overall, he was tolerating his duties, as he was taking prescribed pain medication.

¶ 15        In April 2012, claimant experienced back pain and numbness in his leg and returned to Mercy Works for treatment though he continued to operate the truck through the remainder of 2012. In early April 2013, claimant drove the compressor truck over railroad tracks and "was jostled around and kind of re-injured [his] back again with the pain in [his] lower back and down

[his] left leg." On April 5, 2013, he returned to Mercy Works again. Dr. Diadula ordered claimant off work and again referred him to Dr. Mirkovic.

¶ 16        On May 7, 2013, claimant saw Dr. Mirkovic, who prescribed medication, ordered an MRI, and ordered him off work. Claimant returned to Dr. Mirkovic on May 21, 2013, for the MRI results. Dr. Mirkovic referred claimant to physical therapy and advised claimant he could return to work on May 22, 2013. At that time, claimant was advised his position in the South District was not available but, a similar position in the North District was available. Claimant said he never drove to the particular assigned lot within the North District so, he could only guess that it would take approximately one hour to drive there from his home. On May 28, 2013, claimant asked Dr. Mirkovic for a note which would specifically indicate the imposed work restrictions. Dr. Mirkovic's note indicated claimant could not drive more than 30 minutes at a time. The City did not thereafter invite claimant to return to a light-duty-work assignment at the South District. Claimant did not report to North District for the available position, claiming it was outside of his permanent restrictions. The following exchange on cross-examination occurred:

"Q. Would you agree that on May 28, 2013[,] [Dr. Mirkovic] put in that restriction of traveling, no more traveling than 30 minutes?

A. Yes.

Q. Was that restriction because you had told him that you were unable to sit in a car that long?

A. Yes."

¶ 17        On redirect examination, claimant explained that he had "limitations and problems sitting for long periods of time going all the way back to, at least, the FCE in 2008." Claimant testified he first learned of an available light-duty assignment in the North District on June 23,

2013. This contradicts the record evidence.

¶ 18    Marsha Simmons testified for the City. She said she has been a foreman for the South District Water Department for 14 years. She was claimant's supervisor. She said between December 17, 2011, and April 4, 2013, claimant drove the compressor truck from job to job every day. She said, to her knowledge, claimant drove the truck without any problems. Although, she recalled him having another injury or reporting an injury on April 5, 2013. Claimant told her "he went over a pair of train tracks and he hurt his back again." She sent him to Mercy Works.

¶ 19    According to Simmons, claimant was off work for approximately two months. When he asked to return, Simmons said she did not have a job for him at the South District that did not require operating a backhoe or other machinery. She said she could not accommodate his light-duty restrictions due to "personnel issues." However, she said, at that time, there was an available position driving a compressor truck in the North District. She gave claimant oral instructions to report there. Simmons said the foreman in the North District reported that claimant never showed up and Simmons did not hear anything further.

¶ 20    Simmons testified that she did not receive anything from management or human resources describing claimant's restrictions after April 2013. In her opinion, it would take approximately one hour to drive from the South District to the North District. She said she was still unable to accommodate claimant in the South District and she did not know if they could accommodate him in the North District.

¶ 21    The parties submitted exhibits, which included claimant's medical records and medical bills. Of particular importance to the issue in this appeal is an office note of Dr. Mirkovic dated May 21, 2013, which states: "[Claimant's] symptoms have significantly improved since his last visit. *** [Claimant] felt that his symptoms were significantly lessened and wanted to return

- 6 -

to work. We have referred [claimant] to physical therapy. In the interim, he had to return out to work full time without restrictions as of May 22, 2013. I will see [claimant] in four weeks and earlier if change in presentation."

¶ 22       However, a record dated May 28, 2013, from Dr. Mirkovic's physician's assistant indicated claimant returned "reporting that he could have some frequent left sided low back spasms that radiated into his left buttock as well, however his overall pain had improved a little bit. *** He returns today given issues with regard to RTW [(return to work)] following his last visit." The note continued:

> "He last worked [April 5, 2013,] before his most recent injury. He reports that his employer will now honor his previous restrictions per a conversation this morning with his supervisor, Thomas McMann. He feels this remains a problem given he will have to travel to the northside and he lives on the southside with one hour required in his car, with increased pain with prolonged sitting requiring pain medication. He was previously [five] minutes away from the work site. He has good and bad days. He remains very limited in his day to day activities, with some difficulty dressing."

¶ 23       Dr. Mirkovic's note of the same day states in part:

> "[Claimant returns. He returns to clarify some issues regarding his return to work status and restrictions.
>
> There have been no interval change since his last visit.
>
> I had a long discussion with [claimant]. [Claimant] has been working with the restrictions since May 12, 2010. On May 12, 2010, a letter was forwarded by Mr. Barrett Murphy, the managing deputy commissioner to [claimant], defining his

restrictions. His restrictions were that he could return to work with restrictions of lifting and carrying and pushing and pulling of 5 to 10 pounds frequently and up to 30 pounds occasionally with the height between waist and shoulders. He continues to sit, stand, and walk for 60 to 90 minutes at a maximum time and avoid situation where quick responses were required including bending and twisting and turning. In the letter, [claimant] was instructed to contact his supervisor for assistance if he was asked to do jobs beyond this.

The above restrictions were deemed to be permanent by Dr. [Noren] who authored correspondence on October 9, 2012, to Ms. Miceli [of Genex vocational services]. Dr. [Noren] emphasized that [claimant] was told to adhere to the previous restrictions, notably those delineated on May 12, corresponded by Mr. Murphy.

[Claimant] stated that in addition, in order to comply with the above restrictions, he was unable to operate heavy equipment such as back hose [(*sic*)], combination loaders, *** crawler hoe, vector truck, orange peel, forklift or any other equipment that creates physical movement outside the above restrictions.

[Claimant] states that yesterday, he returned to the employer and was told that the above restrictions will be complied with however, that he would have to travel about an hour away to a job site.

***

PLAN:

1. I recommended [a rehabilitation program].

2. He can return to work within the restrictions which were deemed permanent by Dr. [Noren] and as delineated in Mr. Murphy's correspondence on May 12, 2010.

3. Not participate in the operation of heavy equipment delineated above.

4. [Claimant] will not be allowed to go to commute more than 30 minutes to work at site, pending further low back care per [rehabilitation program]."

¶ 24   On May 28, 2013, the doctor prepared, in letter form addressed to claimant's supervisor, a list of claimant's restrictions that were "permanent and have not been waived." Noticeably absent from the list were restrictions related to prolonged sitting and/or commute time.

¶ 25   The restrictions Dr. Mirkovic refers to were confirmed by Dr. Richard Noren, who examined claimant on October 9, 2012, in an independent medical examination (IME). He noted claimant complained of pain from neck down to lumbar region and radiating into both legs and sometimes down to his left foot. Dr. Noren reported claimant's current activity level as follows:

"Sitting is limited, except when working, he sits for an eight hour shift in a truck. He does sit through a movie, but needs to change positions intermittently, including standing. He limits his driving to 20 minutes due to pain or sitting. As noted, he reported driving two hours for today's appointment."

¶ 26   In Dr. Noren's opinion, claimant was at MMI and could continue to work full duty within the current restrictions, as they are permanent.

¶ 27   The City submitted as an exhibit the IME performed by Dr. Daniel Troy of Advanced Orthopedic Spine Care on December 3, 2013. In response to the question of whether Dr. Mirkovic's 30-minute commute restriction was reasonable, Dr. Troy stated:

"At this time, there are no objective reasons why the claimant cannot drive for more than 30 minutes. There is no objective way that one could put a limitation on his driving restrictions in an appropriate manner. If driving restrictions turn out to be an issue, then I suggest the claimant undergo a functional capacity evaluation to fully evaluate sitting tolerance, as well as to ascertain the claimant's functional habits during testing to therefore come to a conclusion regarding driving restrictions."

¶ 28　　　On September 26, 2016, the arbitrator issued his decision in the matter. He found claimant did sustain a work-related accident on August 8, 2003, and claimant's current condition of ill-being is causally related to the accident. The arbitrator accepted the parties' agreement that all TTD and maintenance benefits due prior to April 5, 2013, had been paid. The arbitrator further ordered the employer to pay TTD benefits of $902.72 per week for 8-1/7 weeks from April 5, 2013, through May 31, 2013, and reasonable and necessary medical services in the amount of $28,468.75. The arbitrator denied any further benefits and penalties.

¶ 29　　　The arbitrator's conclusions were based on the following findings. On May 22, 2013, claimant was released to full duty without restrictions, although the parties agreed to treat this release as actually a release to work under prior permanent restrictions. A modified-duty position was not available at the South District at that time but there was an appropriate position available at the North District. Claimant returned to see Dr. Mirkovic on May 28, 2013, and received a further restriction, limiting claimant's commute time to no more than 30 minutes. The arbitrator found this further restriction not valid,

"given that [claimant] had worked the compressor truck/thawing truck driver position (driving a large truck in the City of Chicago (albeit in ½-hour trips)) for 1

- 10 -

½ years after returning to work December 17, 2011. [Claimant] should have tried to drive to the North District facility. He failed to do so. A reasonable time for [claimant] to have tried this trip would be up to May 31, 2013. The arbitrator cannot support an award of TTD after May 31, 2013."

¶ 30    On January 26, 2018, the Commission affirmed and adopted the arbitrator's decision without further comment. On November 5, 2018, the circuit court of Cook County confirmed the Commission. This appeal followed.

¶ 31                                    II. ANALYSIS

¶ 32    On appeal, claimant argues the Commission erred in finding the City provided a valid compliant job offer in accordance with claimant's restrictions. Claimant argues this finding was against the manifest weight of the evidence when his treating physician specifically set forth a limit on claimant's commute time and the City's job offer was noncompliant with this restriction. He claims he is entitled to TTD after May 31, 2013, vocational rehabilitation, and penalties.

¶ 33    The duration of TTD benefits is a question of fact. *Archer Daniels Midland Co. v. Industrial Comm'n*, 138 Ill. 2d 107, 118-19 (1990). The Commission's determination of the duration of TTD benefits will not be set aside on review unless it is contrary to the manifest weight of the evidence. *Mechanical Devices v. Industrial Comm'n*, 344 Ill. App. 3d 752, 759 (2003). The test for determining whether a factual finding of the Commission is against the manifest weight of the evidence "is not whether this or any other tribunal might reach the opposite conclusion, but whether there was sufficient factual evidence in the record to support the Commission's determination." *Beattie v. Industrial Comm'n*, 276 Ill. App. 3d 446, 450 (1995). To establish entitlement to TTD benefits, a claimant must demonstrate not only that he or she did not work, but also that the claimant was unable to work. *Mechanical Devices*, 344 Ill. App. 3d at 759.

¶ 34    "The Act provides incentive for the injured employee to strive toward recovery and the goal of returning to gainful employment by providing that TTD benefits may be suspended or terminated if the employee refuses" medical services or fails to cooperate in good faith with rehabilitation efforts. *Interstate Scaffolding, Inc. v. Illinois Workers' Compensation Comm'n*, 236 Ill. 2d 132, 146 (2010) (citing 820 ILCS 305/19(d) (West 2004)). "Benefits *may* also be suspended or terminated if the employee refuses work falling within the physical restrictions prescribed by his doctor." (Emphasis added.) *Id.* (citing *Hartlein v. Illinois Power Co.*, 151 Ill. 2d 142, 166 (1992), and *Hayden v. Industrial Comm'n*, 214 Ill. App. 3d 749 (1991)).

¶ 35    Here, the Commission may have considered claimant's sought-after restriction of a 30-minute-commute as the equivalent of a refusal to work. The City had a light-duty job available for claimant. This job was within his long-established physical restrictions but it was not in his desired location. Since March 2008, after claimant's functional capacity evaluation (FCE), Dr. Mirkovic found claimant had reached MMI and released him to work with the following restrictions: work at a light level with lifting up to 20 to 25 pounds occasionally and 5 to 10 pounds frequently. No specific standing or sitting restrictions were included. However, within this "intermediate level" of restrictions, a standard "position" restriction recommended standing, sitting, or walking for 60-90 minutes maximum at a time.

¶ 36    Several references in the record refute the later-imposed 30-minute-commute restriction. For example, in 2010 and 2011, claimant drove a compressor truck for eight hours a day without complaint. He advised Dr. Noren he would shift positions if he became uncomfortable sitting for extended periods of time. In July 2010, Dr. Oliver noted claimant's restrictions included the sitting, standing, or walking restriction of 60-90 minutes maximum at a time. By May 2013, claimant reported to Dr. Oliver's physician assistant that "pain is worse standing, better sitting,

and almost gone when lying flat." On May 29, 2013, the day after he learned of the Northside District opening, claimant contacted Dr. Oliver's officer asking the physician assistant to complete Family Medical Leave Act "paperwork for him to take off from his job." This request was not accompanied by any complaint of sitting for a prolonged period. Indeed, claimant advised Dr. Noren in October 2012 that he drove two hours to the scheduled IME appointment apparently without incident. And, in Dr. Troy's opinion, there were "[n]o objective reasons why claimant cannot drive for more than 30 minutes."

¶ 37 Further, the circumstances surrounding the imposition of Dr. Mirkovic's 30-minute-commute restriction were suspect. The parties agreed that Dr. Mirkovic's note dated May 21, 2013, that claimant could work full time without restrictions, was to mean he could work within his previously imposed permanent restrictions. However, according to Dr. Mirkovic's office note dated May 28, 2013, the City foreman had contacted claimant *that* morning and offered him a light-duty position in the North District, approximately one hour away from claimant's residence. It is reasonable to assume that claimant requested Dr. Mirkovic specifically include a 30-minute commute restriction because claimant did not want the North District job. Dr. Mirkovic complied.

¶ 38 Based on the evidence in this record, where no 30-minute-commute restriction appeared as part of claimant's physical limitations until the North District job offer, the Commission was entitled to interpret claimant's rejection of the offer as a refusal to work a job falling within his physical restrictions. That is, Dr. Mirkovic's addition of a 30-minute-commute restriction did not appear to be based on any objective medical finding.

¶ 39 Further, claimant failed to produce any evidence demonstrating that he was a candidate for vocational rehabilitation. Awards for vocational rehabilitation are granted pursuant to section 8(a) of the Act, which provides, in pertinent part, that an employer shall compensate an

injured employee "for treatment, instruction and training necessary for the physical, mental and vocational rehabilitation of the employee." 820 ILCS 305/8(a) (West 2012). Vocational rehabilitation may include, but is not limited to, counseling for job searches, supervising a job search program, and vocational retraining including education. 820 ILCS 305/8(a) (West 2012). Yet, section 8(a) is flexible and does not limit rehabilitation to formal training. See *Roper Contracting v. Industrial Comm'n*, 349 Ill. App. 3d 500, 506 (2004) (citing *Connell v. Industrial Comm'n*, 170 Ill. App. 3d 49, 55 (1988)).

¶ 40        The Commission determined claimant was offered a job within his restrictions. He refused to accept the position or even attempt to perform the assigned duties. With claimant's refusal, the Commission found he was not entitled to prospective TTD benefits, vocational rehabilitation services, or the imposition of penalties. The Commission's findings were supported by the manifest weight of the evidence and, thus, will remain undisturbed. See *Nascote Industries v. Industrial Comm'n*, 353 Ill. App. 3d 1067, 1074 (2004).

¶ 41        Based on the record before us, we conclude the Commission did not err (1) in denying claimant additional benefits after May 2013 because claimant had been offered a modified duty work assignment but declined it, (2) in finding claimant had been offered a modified duty work assignment within his established and valid medical and physical restrictions, and (3) in denying claimant additional benefits, vocational rehabilitation, or penalties. We find the Commission's decision was supported by the manifest weight of the evidence.

¶ 42                                  III. CONCLUSION

¶ 43        For the foregoing reasons, we affirm the circuit court's judgment, which confirmed the Commission's decision.

¶ 44        Affirmed.